THE STATE OF OHIO, APPELLANT, *v.* HALCZYSZAK ET AL., APPELLEES.

[Cite as State *v.* Halczyszak (1986), 25 Ohio St. 3d 301.]

(No. 85-538—Decided August 13, 1986.)

302

*John T. Corrigan,* prosecuting attorney, and *Frank C. Gasper,* for appellant.

*Friedman, Gilbert & Berezin* and *Gordon S. Friedman,* for appellees William and Ann Halczyszak.

*Marillyn Fagan Damelio,* for appellee Steven Halczyszak.

HOLMES, J. This case concerns the applicability of the plain view doctrine to the seizure of property not described in the search warrant. For the following reasons, we hold that the search inside the building does not offend the Fourth Amendment to the United States Constitution.

The Fourth Amendment provides that:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated and no warrants shall issue, but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Thus, general and exploratory searches are prohibited as an evidence gathering tool. *Boyd* v. *United States* (1886), 116 U.S. 616; *Marron* v. *United States* (1927), 275 U.S. 192. Both state and federal courts are empowered, indeed required, to exclude evidence obtained by means of searches found violative of the Fourth Amendment. *Weeks* v. *United States* (1914), 232 U.S. 383, made applicable to states in *Mapp* v. *Ohio* (1961), 367 U.S. 643 [16 O.O.2d 384].

It has been said that "searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States* (1967), 389 U.S. 347, 357. One exception to the warrant requirement is the "plain view" doctrine, first expressly established in *Coolidge* v. *New Hampshire* (1971), 403 U.S. 443. In essence, the plain view doctrine allows police officers, under particular circumstances, to seize an "article of incriminating character" which is not described in their search warrant. The doctrine "is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost * * *." *Illinois* v. *Andreas* (1983), 463 U.S. 765, 771.

The particular circumstances under which objects of incriminating character could be seized pursuant to the plain view theory were defined in *Coolidge* by means of a three-part analysis. First, the initial intrusion that brought the police into a position to view the object must have been legitimate. Second, the police must have inadvertently discovered the object. Third, the incriminating nature of the object must have been immediately apparent. If the *Coolidge* requirements are complied with, then police need not obtain an additional warrant before they seize the objects observed. The three-prong analysis was subsequently adopted by the vast majority of jurisdictions, including Ohio in *State* v. *Williams, supra* (55 Ohio St. 2d 82 [9 O.O.3d 81]). It is therefore the appropriate standard to be applied to the facts of the case *sub judice*.

Because there is no dispute here as to the validity of either the search warrant or the initial police intrusion which allowed police within sight of the seized objects, we begin our analysis by examining the "inadvertent discovery" facet of the plain view doctrine. The requirement that evidence may be seized only if discovered inadvertently was intended to guard against planned, warrantless seizures. As stated in *Coolidge, supra,* at 471, when police "know in advance [what] they will find in plain view and intend to seize," they must either include such objects in the initial warrant or obtain an additional warrant. They may not plan an arrest or use a limited warrant for the mere purpose of "maneuvering themselves within plain view of the object they want." *Id.* at 470, fn. 26. Otherwise, the exception would swallow up the general rule and circumvent the warrant requirement. Although the lower federal courts have differed on the subject,[1] the emergent test for inadvertent discovery became whether the

---

[1] See, *e.g.,* Comment, "Inadvertence": The Increasingly Vestigial Prong of the Plain View Doctrine (1980), 10 Memp. St. U. L. Rev. 399, 401-402; Comment, "Plain View"—Anything But Plain: Coolidge Divides the Lower Courts (1974), 7 Loy. L.A.L. Rev. 489. For cases showing a refusal to apply *Coolidge*, see, *e.g., United States* v. *Bradshaw* (C.A.4, 1974), 490 F. 2d 1097, 1101, at fn. 3; *United States* v. *Vargas* (C.A.2, 1980), 621 F. 2d 54, 56, certiorari denied (1980), 449 U.S. 854; *United States* v. *Smollar* (S.D. N.Y. 1972), 357 F. Supp. 629.

police had antecedent probable cause to include the object seized in the warrant's description. *Texas* v. *Brown* (1983), 460 U.S. 730.

Appellees assert that the police planned to enter the premises with a limited warrant for the purpose of conducting a general, warrantless search. This the state denies, but it seems to be admitted that the police strongly suspected the premises to be a "chop shop" prior to the search. They seemingly had indicated as much in their affidavit for a search warrant by inclusion of the phrase "due to a prior investigation." However, a "generalized expectation" that other stolen property might be present on the named premises is far less than a belief that particular property will be discovered. *Texas* v. *Brown, supra,* at 744. Appellees presented some evidence relative to the number of tow trucks ordered by the police to infer that the police had a prior intent to seize more than the one vehicle named in the search warrant. However, the official log of tow truck orders admitted into evidence is fully consistent with police testimony that each tow truck was ordered only after an object was determined to be seizable. There was no other evidence which would tend to show that the police knew of any particular incriminating objects other than the vehicle described in the warrant.

Since the police had neither prior, particularized knowledge of the objects ultimately seized, nor prior intent to seize anything other than the object described in the search warrant, it may reasonably be concluded that the police lacked the antecedent probable cause to have justified their inclusion of the additional objects in the search warrant. This satisfies the inadvertent discovery requirement of the plain view doctrine.

Pursuant to *Coolidge,* objects may not be seized under the plain view doctrine unless "it is immediately apparent to the police that they have evidence before them." *Id.* at 466. By way of contrast, in cases following *Coolidge,* a probable cause belief became the measure of whether an object's illegal character was immediately apparent.[2] Furthermore, the most recent case discussing the point, *Texas* v. *Brown, supra,* expressly rejected the requirement that the investigating officer know with "near certainty" that the object seized was evidence. That court instead applied the rule set forth in *Payton* v. *New York* (1980), 445 U.S. 573, 587, that " '[t]he seizure of property in plain view involves no invasion of privacy and *is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity*' " (emphasis *sic*), *Texas* v. *Brown, supra,* at 741-742. Such association may arise from the character

---

[2] *Andresen* v. *Maryland* (1976), 427 U.S. 463; *Payton* v. *New York* (1980), 455 U.S. 573, 587; *Colorado* v. *Bannister* (1980), 449 U.S. 1 (*per curiam*); *Washington* v. *Chrisman* (1982), 455 U.S. 1; *Texas* v. *Brown* (1983), 460 U.S. 729, 741, joined by Justices Powell and Blackmun on this issue, at 746. See, also, cases collected in Comment, "Plain View"—Anything But Plain: Coolidge Divides the Lower Courts, *supra,* at 505-506, fn. 121, for a list of lower courts which have adopted the probable cause standard for the immediately apparent requirement.

of the property itself or, in the case of auto theft, from the circumstances in which the property is discovered. By the term "probable cause," the court intended a " 'practical, nontechnical' probability that incriminating evidence is involved." *Id.* at 742, quoting *Brinegar* v. *United States* (1949), 338 U.S. 160, 176. Where police cannot fairly make a determination based on this standard, then the subject of inquiry requires the more technical determination which the magistrate alone is capable and empowered to make. We therefore conclude that such probable cause to associate an object with criminal activity as is obvious and evident to an ordinary police officer sufficiently satisfies the immediately apparent requirement.

It was asserted below that reliance on *Texas* v. *Brown, supra,* is unwarranted because it is a plurality opinion. It may be noted that *Coolidge,* relied upon by many state courts, and by appellees herein, was also a plurality opinion. The views expressed by the opinion of the court in *Coolidge* evoked disagreement among the concurring opinions as to the plain view analysis. Such disagreement did not keep the opinion of the court from becoming the law of the land. On the other hand, much stronger agreement is found in *Texas* v. *Brown* between the opinion of the court and the concurring Justices, especially on the immediately apparent requirement. See the concurring opinion of Justices Powell and Blackmun, *id.* at 746.

It is apparent that, in appellees' view, each individual auto, auto part, or tool seized was within its own individual zone of privacy. This argument would mean that to enter any individual zone, particularly to view the VIN, was a search which must have been justified separately once the subject of the warrant was found. The core of their analysis rests upon views expressed in *State* v. *Williams, supra,* and *State* v. *Wilmoth, supra* (1 Ohio St. 3d 118). In *Williams,* it was implied that taking down serial numbers from suspicious objects was violative of the Fourth Amendment. *Wilmoth* stated that calling in the VIN of a suspicious vehicle was a search pursuant to a "generalized suspicion." Finally, *Wilmoth* referred to one with specialized training in finding VINs and spotting stolen autos as " 'generalized suspicion' personified"; and the fact that something was immediately apparent "in the eyes of the expert" was considered insufficient. See *Williams, supra,* at 87, and *Wilmoth, supra,* at 119-120. We now reconsider both opinions.

In *Illinois* v. *Andreas, supra* (463 U.S. 765), at 771, the court stated that where an inspection does not intrude on a legitimate expectation of privacy, then there is no search subject to the Warrant Clause. Courts which have considered the inspection of VINs located on the dashboard and other outer parts of autos have also concluded that such inspections are not a search so long as police have a right to be in the place where they made their observation.[3] This would include public places and private

---

[3] *Cotton* v. *United States* (C.A.9, 1967), 371 F. 2d 385, 392; *United States* v. *Graham* (C.A.6, 1968), 391 F. 2d 439, 443, certiorari denied (1968), 393 U.S. 941; *United States* v.

places where police have made a justifiable entry. The mere act of writing down the VIN has also been characterized as neither a search nor a seizure. *United States* v. *DeBardeleben* (C.A. 6, 1984), 740 F. 2d 440, 443. Almost all the above cases involved a search of the files to determine whether the vehicle involved was stolen. In the later cases, use of a computer check to determine whether the vehicle was stolen was upheld. *United States* v. *Kitowski* (C.A. 11, 1984), 729 F. 2d 1418, 1421. Other minimally intrusive tests of the illegality or identity of substances or objects have been upheld. See, *e.g., United States* v. *Place* (1983), 462 U.S. 696.

The United States Supreme Court has most recently spoken on this subject in *New York* v. *Class* (Feb. 25, 1986), ____ U.S. ____, 89 L.Ed. 2d 81. In that case, after police had lawfully stopped defendant's automobile, an officer opened the car door, reached up onto the dashboard to move papers from over the VIN and, in the process, saw a pistol protruding from underneath the driver's seat. At issue was the legality of the intrusion to view the VIN. After noting the part played by VINs in "the pervasive regulation by the government of the automobile," the court stated, "it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile. The VIN's mandated visibility makes it more similar to the exterior of the car than to the trunk or glove compartment. * * * [T]hus to examine it does not constitute a 'search.' " *Id.* at 90.

While the vehicles and parts in the present case were located on private property and not on a public highway as in *Class, supra,* the holding is fully applicable. For public property is indistinguishable from areas of private property upon which the police officer has a legal right to be. See, *e.g., Washington* v. *Chrisman* (1982), 455 U.S. 1, 8-9. Evidence of crime observed by police in either circumstance may be lawfully seized.

We, therefore, conclude that the mere act of viewing a VIN is not a search within the meaning of the Fourth Amendment so long as police are lawfully in a position to make the observation. Nor can it be rationally concluded that a computer check of the VIN is more violative of the Fourth Amendment than viewing it. Consequently, we hold that police may make computer checks of lawfully obtained VINs where their purpose is to negate or establish whether the auto is stolen.

There can be no doubt that specialized training in the practices of professional auto thieves is extremely advantageous to police investigation work. Far from raising the level of police suspicion toward innocent objects and situations, advanced training helps them to distinguish between

---

*Johnson* (C.A.5, 1970), 431 F. 2d 441. The above cases involved opening a car door to retrieve the VIN on the inside edge of the door. See, also, *United States* v. *Powers* (C.A.4, 1971), 439 F. 2d 373, 375; *United States* v. *McCambridge* (C.A.1, 1977), 551 F. 2d 865; *United States* v. *Kitowski* (C.A.11, 1984), 729 F. 2d 1418, 1421.

that which is innocent and that which is illegal. Further, with auto theft and the so-called "chop shop" being the big business that it is today, it is common practice to have trained experts present when executing a search for stolen autos. In the case *sub judice,* the expertise was concomitant with membership in the special Auto Theft Unit.

In *United States* v. *Cortez* (1981), 449 U.S. 411, 417-418, the standard for the assessment of probable cause was broadened to include the specialized knowledge and experience of police officers. In *Texas* v. *Brown, supra,* the suspicion of the police officer based on his knowledge and experience was held to expressly satisfy the standard of probable cause. See *id.* at 742-743, and also the concurring opinion of Justices Powell and Blackmun at 746. Consequently, an officer may rely on specialized knowledge and training "to draw inferences and make deductions that might well elude an untrained person." *Id.*

The unnecessarily broad language of *Wilmoth* would convert every legitimate search or seizure into one violative of the Fourth Amendment if the officers executing the search had specially studied that area of law enforcement. This is not the test set down in *Coolidge,* nor is it generally protective of the people of Ohio. We therefore conclude that in ascertaining the required probable cause to satisfy the immediately apparent requirement, police may rely on their specialized knowledge, training and experience. We further hold that the presence of an auto theft expert at the scene of a lawful search does not offend the Fourth Amendment, but is instead conducive to proper law enforcement and facilitates the recovery of stolen property.

Accordingly, we modify *State* v. *Wilmoth* and *State* v. *Williams* insofar as they are inconsistent with this opinion.

The appellees here assert that the presence of autos, in various stages of assembly and disassembly, and tools necessary to effect such, is entirely consistent with the legitimate business of an auto body shop. They complain that the seizures were effectively made pursuant to a mere "generalized suspicion" and therefore do not conform to the immediately apparent requirement. Appellees further assert that once the police had observed the object of their search, as defined in the search warrant, they had no power to continue looking and were obligated to withdraw from the premises. It is argued below that the plain view doctrine will not justify the police actions here, which appellees characterize as "a general exploratory search from one object to another until something incriminating at last emerges," quoting *Coolidge, supra,* at 466.

This case focuses on the recurring problem of when, and to what extent, the plain view doctrine may be applied to stolen autos and auto parts discovered on private property. It must be remembered that the plain view doctrine and the exigent circumstances doctrine are both separate and distinct exceptions to the Fourth Amendment's warrant requirement. Thus, a discovery not made under exigent circumstances would require

police to seize the entire premises and then obtain a warrant, unless the plain view exception applied, in which circumstances no additional warrant would be required.

The problem posed by the application of the plain view doctrine to stolen autos and auto parts is the requirement that the illegal or stolen character of such items be immediately apparent to police officers. This problem becomes quite acute when police, pursuant to a valid but narrowly drawn search warrant, come upon an entire, illegal auto processing center, *i.e.*, a chop shop, since nothing about an auto itself proclaims its illegal character. In this respect, autos are different from accumulations of white powder or plants possessing distinctive leaves or odors. Consequently, it could never be said that an auto, by itself, looks stolen. If that were the end of the matter, then the plain view doctrine could never apply in situations like the present case. However, we believe that the circumstances discovered upon entry to appellees' premises were so strongly suggestive that the premises was not an honest auto body shop but, instead, an illegal chop shop, that the plain view doctrine was applicable and no further warrant was required.

Since the police were lawfully on the premises and because most of the items were in plain sight, there can be no valid reason for the search to have ended if probable cause existed to believe that those plainly visible objects were evidence of criminal activity. It is the nature of the plain view doctrine to authorize such an extension, once lawfully commenced. The initial lawful intrusion onto the premises penetrated appellees' zone of privacy completely as to those objects in plain sight. That zone of privacy encompassed is the premises described inclusive of the individual objects thereon. Therefore, the police could appropriately stand next to any object on the premises after the initial intrusion for purposes of a closer inspection. See *Washington* v. *Chrisman, supra,* at 8-9.

The trial court acknowledged that the police "knew * * * what they had" from the moment they turned their lights on. The stolen auto, upon which disassembly had begun, was positioned next to an auto frame of the same year and model, with an engine, the transmission, and all necessary tools for working thereon positioned between them. The inference could reasonably be made that a switch of body and engine parts was in progress. At that point, the police had probable cause to believe the stripped-out auto was either an object utilized in a criminal process, *i.e.*, a criminal tool, or another stolen auto. The police computer check of the stripped-out auto's VIN revealed an incriminating title change from a blue-colored title, normally issued to salvage or stripped-out autos and rendering them subject to police inspection before resale, to a yellow-colored title which would allow resale without police inspection.[4] The title to the stripped-out vehicle was registered in the name of a company known to be a title laun-

---

[4] See testimony of Detective Saggio, Transcript of Proceedings, at 350-352.

dry. The overall title change operation, which was illegal, indicated a pattern of organization commensurate with a larger scale of illegal activities. At this point, the police had far more than mere probable cause to believe that this was not a mere isolated stolen auto in an otherwise legitimate auto body shop, but that the entire property was in fact being used as a "chop shop."

As previously noted, police observed a loose VIN plate and three VINs printed on an envelope. Both objects were lying on top of the tools, in an open tool box located between the two autos. Because of the proximity of the open tool box to the above autos and also because VIN plates and numbers are quite distinctive to trained officers, it cannot be doubted that the discovery followed from the legitimate presence of the officers around the two illegally possessed vehicles. A computer check showed that one of the three VINs on the envelope was listed to a reportedly stolen 1980 Oldsmobile Cutlass. The VIN plate was determined to be from another 1980 Oldsmobile Cutlass reported stolen. These VINs did not provide any absolute certainty that another stolen vehicle would be on the premises. However, under the circumstances, a reasonable police officer would have been warranted in assuming that there was probable cause to believe that these two other stolen vehicles, or parts thereof, could be found on the premises.

An engine and transmission were found lying between the subject vehicle and the stripped-out vehicle near the open tool box which contained the VIN plate and numbers. The engine and transmission were examined to determine whether they were parts of either of the stolen 1980 Oldsmobile Cutlasses from which the VIN plate had been removed or to which the VIN found on the envelope belonged. Both the engine and the transmission came back listed to appellee Ann Halczyszak. The number on the transmission matched one of the VINs found written on the envelope, issued in appellee's name to a 1981 Buick Regal. It was most apparent from the circumstances that these parts were to be intermixed with the illegally titled stripped-out auto and stolen vehicle parts to create a single finished automobile. As such, they were criminal tools.

The police, at this point, had ample absolute, factual knowledge to conclude that the building was being used as a chop shop. Consequently, they had probable cause to believe that the other autos visible in the shop were stolen. They did not have certainty of knowledge that these autos were stolen, only excellent reasons to believe such were stolen. The 1973 Corvette, which was first observed by police as they entered the building, was in an area continually visible to police as they made their observations on the stolen and stripped-out vehicles. Since this partially disassembled vehicle was in plain sight, police would have been remiss had they not made a computer check of that auto's VIN. Far from mere probable cause, this minimally intrusive test provided near certainty that the 1973 Corvette was a stolen vehicle, and thus evidence of a crime.

The police seized unidentified Chevrolet Camaro parts which were found stacked together next to the stolen 1973 Corvette. They included the entire sheet metal body parts, doors, bumpers, trunk lid, grill assembly and complete interior. We note that police testimony established the lack of all identifying numbers and that such is a normal condition of these particular auto parts. It is imperative that the police have a factual basis, at the time of seizure, to justify their conclusion that these Camaro parts were stolen. To allow the mere presence of the parts in a chop shop to support their seizure under the plain view doctrine would, in our view, imply that criminal circumstances are sufficient to justify the seizure of objects, which objects are indistinguishable from those legitimately possessed. Accordingly, we affirm the court of appeals as to the suppression of the Camaro parts.

Police testimony was that most of the tools ultimately seized were said to have been found in the area of the subject of the warrant. The trial record developed an accurate picture as to the open tool box, in which was discovered the VIN plate, and several socket sets which were described as lying immediately near the disassembly operation. The tools' proximity to the stolen and stripped-out vehicles, where disassembly had been initiated, suggests irresistibly that the tools in the tool box and the socket sets were used in illegally changing the body parts. Unfortunately, the record is not well developed with respect to the remaining tools seized, and each tool or collection thereof ought to be separately analyzed. We are not apprised which other tools were discovered in the same immediate vicinity or whether other tool containers were open or closed. It should be inquired below on remand where the other tools were found, in what way were they used in this criminal enterprise and how their use, if illegal, was immediately apparent as such to the police.

When the police determined to look outside the building, they were in possession of a VIN and VIN plate from individual 1980 Oldsmobile Cutlasses reported as stolen. Consequently, there may have been probable cause to extend the search to the automobiles observed to be blocking the bay entrances and to other parts of vehicles nearby. However, the record does not fully develop the justification of police movement from inside the building to the outside premises, and the plain view exception is not obvious in its application to those objects so observed.

We, therefore, remand the cause to the trial court for a more thorough inquiry of the seizure of objects discovered outside the building as well as those tools not specifically excepted above. All other seizures are upheld. The decision of the court of appeals regarding that vehicle which is the subject of the warrant is affirmed and the remainder of that decision is reversed.

*Judgment affirmed in part*
*and reversed in part.*

LOCHER, DOUGLAS and WRIGHT, JJ., concur.

CELEBREZZE, C.J., concurs in part and dissents in part.

SWEENEY, J., dissents with opinion.

C. BROWN, J., dissents without opinion.

CELEBREZZE, C.J., concurring in part and dissenting in part. I concur in the majority's determination that the Oldsmobile (specified in the warrant), its "clone" car, and certain tools (which were in close proximity to or adjacent to these two cars) were lawfully seized and admissible as evidence. I also agree with that portion of today's decision which holds the officers' seizure of patently innocent automobile parts and tools discovered elsewhere on the premises was not justified under the plain view doctrine and that these items could be suppressed as evidence. For the reasons which follow, however, I dissent from the remainder of the holding and I disagree with the vague inquiry standards adopted by today's decision.

It is not surprising that the majority's analysis is blemished because its thesis presumes the existence of unlawful activity. By way of example only, the majority posits the "problem" presented by this case as follows:

"This case focuses on the recurring problem of when, and to what extent, the plain view doctrine may be applied to *stolen autos and auto parts* discovered on private property. * * *

"* * * This problem becomes quite acute when police, pursuant to a valid but narrowly drawn search warrant, come upon an entire, *illegal auto processing center, i.e., a* chop shop. * * *" (Emphasis added.)

The "problem" with these passages is that they evince the majority's faulty preconception that unlawful actions, which are later revealed by the fruits of the search, may be considered in the court's plain view analysis. This is like calling the game before it is played.

The majority's reliance on *New York* v. *Class* (1986), ___ U.S. ___, 89 L. Ed. 2d 81, to justify its ruling is also a misnomer. The *Class* decision was not premised on — and, in fact, does not even mention — the plain view doctrine. Rather, that pronouncement, whatever its merits,[5] focuses

---

[5] In *Class* police officers observed an automobile being driven with a cracked windshield while speeding, both traffic offenses. After the vehicle was stopped, the driver left the car and informed the officers that he did not have a driver's license. One officer, in need of the car's VIN, reached inside the car to remove some papers blocking his view of the VIN plate which is located on the dashboard where it can normally be seen through the windshield, provided the car is in a public place. At this point, the officer spotted and seized a hidden handgun. The New York Court of Appeals suppressed the weapon. However, the United States Supreme Court held that, under the Fourth Amendment, the gun was discovered pursuant to a valid search and was therefore admissible as evidence.

Interestingly, on remand the New York Court of Appeals disagreed with the Supreme

chiefly on a number of past decisions concerning the lessened expectation of privacy associated with the use of automobiles. In upholding the seizure and admissibility of a hidden handgun discovered by the police after stopping the defendant for traffic violations, the *Class* majority concentrates on factors not pertinent to this case, such as: "highway safety"; "concern for the officer's safety"; a recognition that since the vehicle was being driven on the road, "the exterior of the car * * * is thrust into the public eye, and thus to examine it does not constitute a 'search' "; and that the officers' scrutiny of the vehicle's identification number (which led to the discovery of the gun) was permissible because there was a lower expectation of privacy associated with driving a car since the viewing was part of a justified traffic stop. *Id.* at 89-93. The crux of the polemical automobile exception recognized in *Class* was the unlawful and public operation of a motor vehicle on New York's highway coupled with the court's professed concern for the traffic officer's safety. By contrast, in the instant case we are presented with a warrantless search of parked cars, mechanic's tools, and parts located in a body repair shop, on private property, out of sight, and secured behind a closed gate and locked doors. Indeed, as recognized by the parties herein and the courts below, justification for this search must be premised on another recognized exception to the warrant requirement, such as exigent circumstances (which has not been argued) or the plain view doctrine. *Class,* in short, ends where the case before us begins.

The seminal case concerning the requisite elements which must be present to justify a warrantless seizure of property under the "plain view" exception is *Coolidge* v. *New Hampshire* (1971), 403 U.S. 443. The plurality opinion, authored by Justice Stewart, states that in order to invoke the "plain view" exception, police must demonstrate three requirements: (1) a lawful intrusion, (2) an "inadvertent" discovery, and (3) that the criminal nature of the evidence seized was "immediately apparent" to the seizing officers. The *Coolidge* analysis is widely followed, was adopted by the Sixth Circuit Court of Appeals in *United States* v. *Gray* (C.A.6, 1973), 484 F. 2d 352, certiorari denied (1974), 414 U.S. 1158, and has been the law of Ohio. See *State* v. *Williams* (1978), 55 Ohio St. 2d 82 [9 O.O.3d 81].

The test in Ohio, derived from *Coolidge, supra,* was set forth in *Williams, supra,* at paragraph one of the syllabus, as follows:

"In order for evidence to be seized under the plain view exception to

---

Court's thesis and held that New York's state Constitution demanded suppression. The defendant's conviction, even though the nation's high court ruled against him, is now vacated. See *People* v. *Class* (1986), 67 N.Y. 2d 431, 503 N.Y. Supp. 2d 313, 494 N.E. 2d 444.

A more promising source of guidance may be forthcoming. Recently, the United States Supreme Court granted certiorari to review the question of whether police, while conducting a lawful search for weapons in an apartment, may scrutinize stereo components suspected as stolen, for the purpose of locating, recording, and subsequently tracing the serial numbers. See *State* v. *Hicks* (1985), 146 Ariz. App. 533, 707 P. 2d 331, certiorari granted (1986), ____ U.S. ____, 89 L. Ed. 2d 912.

the search warrant requirement it must be shown that (1) the initial intrusion which afforded the authorities the plain view was lawful; (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent to the seizing authorities.''

The holding of our decision in *Williams,* at paragraph two of the syllabus, is especially relevant to this case:

''Where a police officer, in the course of executing a search warrant, discovers automobile body parts not described in that warrant, and harbors no more than a generalized suspicion that such parts have been stolen, the incriminating nature of the parts cannot be said to be 'immediately apparent,' and the seizure of the parts will not be upheld under the plain view doctrine.''

At 86 we expanded on the reasoning supporting our holding:

''The plain view doctrine is a court-created exception to the fundamental safeguard, guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article I of the Ohio Constitution, that warrants issued upon a proper showing of probable cause and particularly describing the items to be seized must set the constitutional limits to police intrusions into the lives of the citizenry. One primary objective of the warrant requirement is that searches deemed necessary should be as limited in scope as possible. Otherwise, the issuance of a warrant would serve as the justification for a general search, during which police officers could rummage through a person's belongings in quest of unidentified incriminating evidence.

''We decline to contort the plain view doctrine so as to justify the seizure here under review, since we would thus be allowing this narrow exception to the warrant requirement to swallow the rule. Although Detective Tell, at the time of the search, harbored a generalized suspicion that the Oldsmobile body parts were stolen, his own testimony at the hearing on the motion to suppress indicated that upon mere inspection of these seemingly innocuous items it was not 'immediately apparent' that appellee was in possession of property which Tell knew, or had probable cause to believe, was contraband. We therefore conclude that Detective Tell's seizure of the Oldsmobile parts was inconsistent with the thrust of the plain view doctrine.''

This analysis also parallels that of Justices Stewart, Brennan and White in their concurrence to *Stanley* v. *Georgia* (1969), 394 U.S. 557, which states at 571-572:

''The controlling constitutional principle was stated in two sentences by this Court more than 40 years ago:

'' 'The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As

to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' *Marron* v. *United States*, 275 U.S. 192, 196.

"This is not a case where agents in the course of a lawful search came upon contraband, criminal activity, or criminal evidence in plain view. For the record makes clear that the contents of the films could not be determined by mere inspection. * * *

"* * * This record presents a bald violation of that basic constitutional rule. To condone what happened here is to invite a government official to use a seemingly precise and legal warrant only as a ticket to get into a man's home, and, once inside, to launch forth upon unconfined searches and indiscriminate seizures as if armed with all the unbridled and illegal power of a general warrant."

More recently, we again considered the "plain view" exception as it relates to an automobile body shop in *State* v. *Wilmoth* (1982), 1 Ohio St. 3d 118, certiorari denied (1983), 460 U.S. 1081, which case is all but overruled by today's majority. In *Wilmoth,* the police obtained a warrant which authorized a search of an auto shop for certain specifically described property. However, once on the premises, the police, as in the instant case, conducted a general search during which they "scrutinized all the vehicles on hand."

Following the standards set forth in both *Williams* and *Coolidge,* we again declined to interpret the "plain view exception" in a broad manner by which the exception would engulf the prohibition against warrantless searches. In *Wilmoth,* we refused to allow a general warrantless search premised on the mere "suspicion" of the police which was found not to constitute probable cause. We held, and I still believe, that such a strained interpretation would transform a "properly authorized and specific search warrant into an admission ticket that provides entry for the purpose of conducting a general search." *Id.* at 120.

As the majority correctly observes, since our decisions in *Williams* and *Wilmoth,* a faction of the United States Supreme Court seems to have relaxed or at least restated the requirements of "immediately apparent" and, to some degree, "inadvertent." *Texas* v. *Brown* (1983), 460 U.S. 730.

In *Brown* the police stopped a car during the nighttime at a routine driver's license checkpoint. The driver was asked for his license. The officer shined his flashlight into the car and saw the driver drop a balloon, knotted near the tip, onto the seat beside him. While the driver was searching the glove box for his license, the officer, shifting his position slightly, noticed small plastic vials, more balloons and loose white powder spilling from the glove box. Based upon the officer's expertise in drug abuse, he was aware that balloons were commonly used to package narcotics. The driver failed to produce a license and was asked to get out of the car. Picking up the dropped balloon, the officer found that it appeared to contain a powdery substance. The driver was arrested and the car's contents were inventoried. The issue before the high court was, of course,

whether the seized contraband was admissible pursuant to the "plain view" exception.

Justice Rehnquist announced the judgment and delivered a plurality opinion which observed that "the 'plain view' doctrine permits the warrantless seizure by police of private possessions where three requirements are satisfied. First, the police officer must lawfully make an 'initial intrusion' or otherwise properly be in a position from which he can view a particular area. * * * Second, the officer must discover incriminating evidence 'inadvertently,' which is to say, he may not 'know in advance the location of [certain] evidence and intend to seize it,' relying on the plain-view doctrine only as a pretext. * * * Finally, it must be 'immediately apparent' to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure. * * *" (Citations omitted.) *Id.* at 736-737.

In my opinion, it has been correctly observed that probable cause is a flexible, common-sense standard. In *Brown,* the court held that, under the facts available, the officer's belief that the items were contraband and would be useful as evidence of a crime was reasonable. Further, the officer's discovery of the balloon occurred *inadvertently* during the course of a lawful routine driver's license check. Lastly, in light of the officer's expertise in drug paraphernalia, the criminality of the powder, balloons and vials was found to be *immediately apparent* because of the common use of balloons in packaging narcotics—that is, the officer had sufficient probable cause to believe that the balloon contained narcotic drugs.

Although of guidance, there are several critical distinctions between the setting in *Brown* and the case *sub judice.* First, much of the discussion in *Brown* concerned the threshold issue of whether the officer was lawfully in a position to observe the evidence in question. In the instant case, the lawfulness of the police's *initial* entry is not at issue. It must also be noted that there was no search involved in *Brown* when the *inadvertent* discovery was made. Here, we have a specific search warrant and an entry onto private property. There is no question that the police conducted a sweeping search on private property in the case at bar which led to their discoveries.

One important distinction in the scenarios is that, unlike the officer in *Brown,* the police in this case were *not* "lawfully engaged in an activity" during their unauthorized exploratory search conducted after locating the stolen Oldsmobile.

When the officer looked into the car involved in *Brown,* he recognized drug paraphernalia. It is doubtful that the high court would have found a practical, nontechnical probability that incriminating evidence was involved if the officer had looked through the windshield and merely seen a VIN plate properly attached to the automobile. Further, unlike the car in *Brown,* these vehicles were on private property and were not going anywhere.

While not on all fours with the case *sub judice, Brown* is noteworthy and the pronouncement must be reconciled with the myriad of situations which evolve in the real world. However, quoting passages from *Brown,* or any opinion for that matter, out of context and then applying them in a rigid fashion to dissimilar factual settings is not an appropriate substitute for careful reasoning. More than a mere color matching of cases is required. Further, the decisions in *Brown* and *Coolidge* should not be viewed in a vacuum since considerable guidance can be gleaned from their progeny.

For example, the federal Sixth Circuit Court of Appeals has issued a number of post-*Brown* decisions concerning the "plain view" exception which have been ignored by the instant majority. These decisions are of great significance in their analysis of the "plain view" exception to the Fourth Amendment warrant requirement.[6] For that reason, I deem it essential to address the instant cause in light of the following Sixth Circuit decisions.

In *United States* v. *Szymkowiak* (C.A.6, 1984), 727 F. 2d 95, Toledo police officers obtained a warrant to search the defendant's property for specified jewelry and a T.V. set. During their search, the police discovered a number of firearms and ammunition, including an AR-15 rifle, which were not specified in the warrant. The officers summoned an agent from the Bureau of Alcohol, Tobacco and Firearms ("ATF") to the scene who opined that without disassembly he could not ascertain if the rifle had been illegally adapted for fully automatic performance. Believing that Ohio, but probably not federal, laws had been broken, the officers seized the guns based on the ATF agent's recommendation. As pertinent to the issue of plain view, the defendant was charged with unlawful possession of an automatic weapon, the AR-15 rifle. The defendant's motion to suppress was denied by the trial court which held that the "plain view" exception to the warrant requirement applied.

The court of appeals reversed the trial court, holding that criminality was *not* "immediately apparent" to the officers from their "plain view" of the seized weapon. The court found that the *Brown* court's formulation of the "immediately apparent" test was consistent with the Sixth Circuit's pre-*Brown* pronouncements. By way of example, the court at 97-98 compared its decisions in *United States* v. *Gray* (C.A.6, 1973), 484 F. 2d 352, certiorari denied (1974), 414 U.S. 1158, and *United States* v. *Truitt* (C.A.6, 1975), 521 F. 2d 1174, as follows:

"* * * In *Gray,* we declared unconstitutional the seizure of rifles in-

---

[6] Under the federal Constitution's Supremacy Clause, this court is bound by the decisions of the United States Supreme Court and, furthermore, the decisions of the Sixth Circuit Court of Appeals are authoritative, as to questions of federal law. *State* v. *Kruze* (1973), 34 Ohio St. 2d 69, 70 [63 O.O.2d 115]; *State* v. *Leigh* (1972), 31 Ohio St. 2d 97, 99 [60 O.O.2d 80]; *Harris* v. *Pennsylvania Rd. Co.* (1939), 135 Ohio St. 560 [14 O.O. 429]; *Railway Passenger Assur. Co.* v. *Pierce* (1875), 27 Ohio St. 155. See, also, *Sims* v. *Georgia* (1967), 383 U.S. 538, 544.

advertently discovered by officers while they executed a valid search warrant for alcoholic beverages. In that case, the police removed the rifles from the defendant's closet, examined them, copied down their serial numbers and seized them. We concluded first that the incriminating nature of the seized evidence was not 'apparent' to the officers:

" [']The rifles were not contraband; there was no nexus between the rifles and the crimes of selling and possessing intoxicating liquor without a license . . . . [']

"484 F. 2d at 355. Even if the incriminating nature of the rifles had been 'apparent,' the *Gray* Court concluded, the appearance of criminality was not 'immediate.' We found that[:]

"[']the officers *at that time* [did not] have any knowledge of any other crimes. It was only after Trooper Brodt had seized the weapons, copied down the serial numbers, left the defendant's premises, and then ran the information taken off the rifles through the National Crime Information Center that he learned that they were stolen and hence incriminating.['] (emphasis added). 484 F. 2d at 355.

"In *United States* v. *Truitt,* we reiterated these general guidelines to the 'plain view' exception, but upheld the seizure of evidence under the particular facts of that case. While conducting a lawful search, the executing officers in that case inadvertently discovered a sawed-off shotgun. This Court concluded that probable cause was 'immediately apparent' to those officers from the particular nature of the viewed object and the circumstances of its discovery. We stated that *Coolidge*[:]

"[']fully provides the justification for the seizure of the shot-gun if that shot-gun can qualify as "an incriminating object" found under circumstances where "it is immediately apparent to the police that they have evidence before them."[']

"Unlike the officers in *Gray,* 521 F. 2d at 1174, the executing officers in *Truitt* could reasonably derive probable cause to believe that the seized evidence was incriminating from the very moment they 'first discovered' the 'intrinsically' suspicious evidence. 521 F. 2d at 1176-1177. The officers' knowledge of the incriminating nature of the shot-gun in *Truitt,* then, was 'immediate.' Moreover, we concluded in *Truitt* that the criminal nature of the possession of a sawed-off shotgun was 'apparent' from the mere discovery of the object:

"[']a sawed-off shotgun in private hands is not an intrinsically innocent object. The possession of it is a serious crime, except under extraordinary circumstances.[']

"521 F. 2d at 1174; citing, *Porter* v. *United States,* 335 F. 2d 602, 607 (9th Cir.), *cert. denied,* 379 U.S. 983, 85 S. Ct. 695, 13 L. Ed. 2d 574 (1964). In contrast to the seizure in *Gray,* the seizure in *Truitt* was accomplished in a circumstance in which probable cause was both 'immediate' and 'apparent' to the officers from the intrinsic nature of the object.

"The standard which we have gleaned from *Gray, Truitt,* and *Brown,* therefore, requires a reviewing court to determine whether, under the circumstances of each case, probable cause was both 'immediate' and 'apparent' to the executing officers from the nature of the object viewed. We believe that this standard is mindful of the Supreme Court's constant warning that any exception to the Fourth Amendment's Warrant Clause be 'carefully delineated.' * * *

"*The requirement that probable cause be 'immediate' from the discovery of the object specifically averts the 'danger inherent in such a situation that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will.' See Brown,* 103 S. Ct. at 1546, (Stevens, J., Concurring). [Emphasis added.] As a reviewing court, we best obviate the risk of prolonged, warrantless rummaging by objectively determining whether *at the time* of discovery the officer had probable cause to connect the item with criminal behavior. *Brown,* 103 S. Ct. at 1546. To prevent any such abuses of the warrant requirement, we must also ensure that probable cause be 'apparent' to the executing officers at the time of discovery. In considering whether probable cause was 'apparent' to the executing officers, a reviewing court should be duly mindful of the executing officers' particular, subjective training and experiences. *See Brown,* 103 S. Ct. 1545 (Powell, J., Concurring); *United States* v. *Cortez,* 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). Where an executing officer's probable cause to connect the viewed item with criminal behavior is not *both* 'immediate' and 'apparent,' however, the individual's interests in retaining possession of property and in maintaining privacy, *see Brown,* 103 S. Ct. at 1546, and society's interest in lawful enforcement activity, *see Johnson* v. *United States,* 333 U.S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948), are greatly compromised." (Emphasis *sic.*)

A unanimous panel in *Szymkowiak* then applied this controlling case law to the record in the case before it and concluded that the "officers' probable cause to connect the seized weapon with criminal activity was neither 'immediate' nor 'apparent.' " *Id.* at 98. Neither the police nor the ATF agent could determine at the time of the seizure whether the weapon was unlawfully converted to an automatic firearm. In that case, as in this case, a further examination of the property was needed.

"* * * Unlike the appearance of the intrinsically incriminating sawed-off shotgun in *Truitt,* or the knotted balloon in *Brown,* * * * the appearance of the seized weapon in this case did not provide even a firearms expert with probable cause for the seizure. * * *

"* * * The record in this case is clear that the executing officers who discovered the weapon could not '*at the time*' of discovery determine whether its possession was unlawful. *See Gray,* 484 F. 2d at 356. *Like the officers in Gray, the executing officers copied down and called in the firearms' serial numbers to determine whether the weapons were stolen.*

Like the officers in *Gray,* the executing officers also found through NCIC that the seized rifle had not been stolen. Finally, like the officers in *Gray,* the executing officers did not have probable cause to believe that the possession of such a rifle was incriminating. In *Brown,* the Supreme Court noted that probable cause 'requires that the facts *available to the officer'* would warrant that officer to believe that he or she may have discovered incriminating evidence. 103 S. Ct. at 1543. From the 'facts available' to the executing officers in the case before us, they could not determine whether they had discovered evidence of a criminal nature. *Indeed the officers['] very decisions to call NCIC for facts not available to them* and to call ATF for an examination which was beyond their knowledge to perform, *indicate that they did not from the 'facts available to them' see Brown,* 103 S. Ct. at 1543, *'at the time,'* [s]ee, *Gray,* 484 F. 2d at 356, *of discovery have probable cause to believe that the firearm was incriminating.* Under these circumstances, we can not conclude that the officers' probable cause derived 'immediately' from the discovery of the object." (Emphasis added in part.) *Szymkowiak, supra,* at 99. See, *e.g., Donata* v. *Hooper* (C.A. 6, 1985), 774 F. 2d 716, 719.[7]

Also relevant is the Sixth Circuit's recent consideration of the second prong of the "plain view" exception, "inadvertence," which remains ap-

---

[7] Additional guidance concerning "immediately apparent" is also found in the more recent case of *United States* v. *McLernon* (C.A. 6, 1984), 746 F. 2d 1098. In *McLernon,* two undercover federal narcotics agents arrested the defendant on charges related to, *inter alia,* unlawful interstate transport of narcotics. During the course of arresting one of the drug conspirators, the agents seized a note pad and calendar in their room which the government contended were admissible pursuant to the "plain view" exception (upon examination of the calendar cocaine was also discovered). The court stated at 1125-1126 that "[w]e must determine whether the agent's [*sic*] probable cause to believe that the seized note pad and calendar were incriminating objects was both 'immediate and apparent' to them from their plain view of those objects.

"'* * *

"'* * * [W]e find that probable cause of criminality was neither immediate nor apparent to the agents from their plain view of the items. Unlike the sawed-off shotgun in *Truitt* and the knotted balloon in *Brown,* the note pad and calendar in this case were hardly 'intrinsically' incriminating. Indeed such items are found in plain view of virtually every desk across this country. [Automobile parts, mechanic's tools and cars in need of repair are also found in every body shop 'across this country.'] We do not, and cannot, subscribe to a rule of law which allows officers of the state to seize an item as evidence *merely* because it is in 'plain view.' *See Coolidge,* 403 U.S. at 470, 91 S. Ct. at 2040. The agents' 'immediate' sensory perception, *see id.* at 471, 91 S. Ct. at 2040, must produce probable cause of crime. In the case at bar, the agents' 'immediate' perceptions produced only visual images of two 'intrinsically innocent' items.

"'* * *

"'* * * Like the agents in *Gray* and *Szymkowiak,* therefore, *the agents in this case did not acquire probable cause of criminality until after they seized and examined evidence not 'immediately apparent' to them.* We conclude, therefore, that the evidence contained inside the calendar should have been suppressed because the agents' probable cause was neither 'immediate' nor 'apparent' to them from their 'plain view' of the objects."

plicable to "plain view" analysis pursuant to *Coolidge* and in light of *Brown.* The Sixth Circuit in *United States* v. *Morgan* (C.A. 6, 1984), 744 F. 2d 1215, again determined that its past interpretations, this time concerning "inadvertence," were both consistent with *Brown* and correct. Citing *United States* v. *Hare* (C.A. 6, 1979), 589 F. 2d 1291, with approval, the court observed at 1223: "The term 'inadvertence' in this context does not necessarily mean that the viewing of the evidence must be 'unexpected' or 'unanticipated.' This Court, in interpreting 'inadvertence,' observed:

" 'We conclude, then, that "inadvertence" in this context means that the police must be without probable cause to believe evidence would be discovered until they actually observe it in the course of an otherwise-justified search. There are many times when a police officer may "expect" to find evidence in a particular place, and that expectation may range from a weak hunch to a strong suspicion. However, the Fourth Amendment prohibits either a warrant to issue or a search based on such expectation. Yet if in the course of an intrusion wholly authorized by another legitimate purpose, that hunch or suspicion is confirmed by an actual observation, the police are in precisely the same position as if they were taken wholly by surprise by the discovery.'

"*United States* v. *Hare,* 589 F. 2d 1291, 1294 (6th Cir. 1979). *See also Texas* v. *Brown, supra,* 103 S. Ct. at 1543."

As applied to this case, I believe the seizure did not comport with either the inadvertent or the immediately apparent requirements of *Coolidge, Brown, Williams, McLernon, Szymkowiak* and *Morgan.*

First, the discovery was not inadvertently made during the course of executing the specific warrant. Rather, the bulk of the discoveries resulted from a later systematic *general* search of the building and yard. Following discovery of the car specified in the warrant, a squad of officers subsequently launched an exploratory search far outside the scope of the warrant. To use the language of the Sixth Circuit, the discovery must be "in the course of an otherwise-justified search." *Morgan,* at 1223. As such, the police must be "taken wholly by surprise by the discovery" *or* their previous "expectation * * *, hunch or suspicion" must be confirmed by an actual observation during "the course of an intrusion wholly authorized by another legitimate purpose. * * *" *Id.* In this case, the police had the shop under investigation and had believed it to be a "chop shop," although this belief was not shared with the issuing magistrate. The discovery was not wholly by surprise. Nor did it occur during the course of the authorized search. For the most part, the discoveries were not inadvertent but resulted from an impermissible warrantless general search.

Second, and just as important, the incriminating nature of the other automobiles (except for the "clone" car), just like the parts and patently innocent tools, was not immediately apparent to the seizing authorities. This was, after all, an auto body repair shop. Body parts, cars in need of repairs and mechanic's tools are not incriminating on their face when

found in a garage. As in *Gray, supra,* at 355, "the officers at that time [did not] have any knowledge of any other crimes. It was only after * * * the serial numbers * * * [were] run * * * through the National Crime Information Center that * * * [the officers] learned that they were stolen and hence incriminating." The criminal nature of these cars, parts and tools was not immediate and apparent from the very moment these officers discovered the evidence as with the *intrinsically suspicious* sawed-off shotgun in *Truitt.* Rather, as in *McLernon,* "the agents' 'immediate' perceptions produced only visual images of 'intrinsically innocent' items." *Id.* at 1126.

I am left with a conclusion that our three-prong test established in *Williams* continues to reflect the controlling law in this appeal and that the majority's wholesale modification of our past rulings is unjustified.

Indeed, our decision in *Williams* has been cited, adopted and followed not only by Ohio's trial and appellate courts, but also by a number of our sister states which will no doubt be amazed at our sudden and questionable departure from such settled legal principles. *E.g., People* v. *Harmon, infra* (Illinois); *State* v. *Moore* (W. Va. 1980), 272 S.E. 2d 804; *Reeves* v. *State* (Alaska 1979), 599 P. 2d 727; *State* v. *Dingle* (1983), 279 S.C. 278, 306 S.E. 2d 223.

For example, in *People* v. *Harmon* (1980), 90 Ill. App. 3d 753, 46 Ill. Dec. 27, 413 N.E. 2d 467, an Illinois appeals court considered the warrantless seizure of a CB radio found inside a television set during state agents' search of the home of a junkyard dealer for other specifically named items listed in a valid search warrant. The Illinois court noted the agents only determined the radio to be stolen after running its serial number and later locating a theft report. The court held that the discovery was not inadvertent, and since the criminality of the radio was not immediately apparent to the police, the seizure was not subject to the plain view exception. In addition to the court's reliance on *Coolidge,* it found clear guidance from this court's decision in *Williams* as follows:

"In *State* v. *Williams* (1978), 55 Ohio St. 2d 82 [9 O.O.3d 81], 377 N.E. 2d 1013, an analogous situation was presented. In *Williams,* a warrant had been issued for the seizure of certain stolen property, specifically, a hydraulic jack, a cutting torch, and an acetylene tank. When at the garage to conduct the search, the police officers noticed that the defendant was working on a partially assembled automobile and that numerous automobile parts of the same shade were lying near the vehicle. The defendant told one police officer that the vehicle was his and that he had recently purchased it from a local salvage yard. The officer phoned the salvage yard and was informed that two automobiles were sold to the defendant in a stripped condition, missing various body parts. The officer noted that the two cars in the shop had attached to them, or lying near them, various car parts. The officer seized the equipment listed in the search warrant, and based on the information obtained by the telephone call, seized the two

cars and miscellaneous car parts. The Supreme Court of Ohio held that the officer did not have probable cause to believe, upon initial inspection of the automobile parts, that the defendant was in possession of contraband. The court noted that it was necessary for the police officer to inquire where the vehicles were purchased and place a telephone call to the salvage yard before the officer became suspicious that the parts might have been stolen. "'* * *

"'* * * We decline, like the court in *Williams,* to contort the plain-view doctrine to encompass this situation." *Id.* at 757-758, 413 N.E. 2d at 470-471.[8]

More recently, the case of *Manning* v. *State* (Ind. App. 1984), 459 N.E. 2d 1207, presented a factual setting strikingly similar to the case at bar. In that case, the police were searching a salvage yard suspected of being a stolen vehicle center pursuant to a warrant which authorized a search for a stolen Oldsmobile. While on the premises, the officers also checked the VIN plates and license numbers of other vehicles, ran computer inquiries on the numbers, and discovered a stolen vehicle. The state, as in this case, argued that the search for other stolen vehicles was justified under the plain view doctrine. The Indiana appellate court disagreed, holding that the search was unlawful. The court, consistent with *Coolidge, Williams* and *Wilmoth,* ruled at 1212 that "[t]he criminality of these vehicles was not 'readily apparent', and the vehicles had no connection with any crimes known to the police at the time of the search. * * * Clearly the search was extended into places where the maroon Oldsmobile could not have been found. The facts demonstrate that the officers used their presence on the property to improperly conduct a 'general exploratory search from one object to another until something incriminating emerge[d].' *Coolidge, supra.* Given the facts and circumstances, the officers had no more than a mere suspicion that the vehicles had been stolen, which does not justify a search beyond the scope of the warrant." See, also, *People* v. *Alberti* (1984), 124 Misc. 2d 532, 476 N.Y. Supp. 2d 1004.

I also take issue with the majority's version of the facts in this case and its characterization of the apparent nature of the evidence seized. The observations which follow are by way of illustration only and are not intended as an exhaustive account of the majority's recitation.

The majority glosses over the size of the police force executing the warrant to seize the single Oldsmobile. On the evening in question, a squad

---

[8] Similarly, the Supreme Court of West Virginia in *State* v. *Moore, supra,* relied on this court's past interpretation, among others, of the inadvertence element of the plain view exception. "'* * * [P]olice may not under the guise of an initial lawful search into a constitutionality [*sic*] protected area, such as a search incident to an arrest, use this action as a means of conducting a broad warrantless search. The real import of this limitation is to ensure that the police do not convert a lawful arrest or use one of the narrowly recognized exceptions for a warrantless search as a springboard for a broad warrantless exploration to seize incriminating evidence." *Id.* at 814.

of police, including three auto theft unit detectives, two uniformed officers, the theft unit's supervisor and an auto theft evidence technician, all went to the body shop to execute a warrant for a single automobile. Although they located the object of their search within minutes, they then proceeded to accomplish what they intended to do all along—they instituted a general exploratory search for additional evidence of wrongdoing. As noted previously, I agree with the court of appeals which held they improperly "used the original, limited warrant as an 'admission ticket.' "

The majority also states that certain evidence was inadvertently discovered in tool boxes. One can only speculate why the police would be searching inside tool boxes for a white Oldsmobile.[9]

In its statement of the case, the majority notes that "[c]ertain tools and mechanical implements known to be utilized in changing body parts from one vehicle to another, and positioned for such immediate use, were also confiscated." In reality, the property seized consisted of such nefarious items as tool chests, hammers, spray guns, a buffer and some tape. In fact, the police seized not only the tools by the Oldsmobile but nearly all of the mechanic's tools in the shop; I fail to understand the need for any further determination regarding these items on remand because the criminal nature of these body shop tools, discovered in the body shop, was admittedly *not* immediately apparent.[10]

Although the police were unable to identify some cars as stolen, they towed them anyway, for processing.[11] In fact, one car was identified as

---

[9] Although police may be lawfully on the premises with a valid search warrant, the search is limited to those areas which may reasonably contain the items listed in the warrant. Under this "elephant in the shoe box" rule, there is authority that contraband found in a container which could not logically contain items listed in the warrant cannot be justified under the plain view doctrine. See, *e.g., Jones* v. *State* (Okla. Crim. App. 1981), 632 P. 2d 1249.

[10] Detective Saggio testified as follows:

"Q.  You took a Craftsman grey metal toolbox, you took another plain metal toolbox, you took five socket sets?

"A.  Correct.

"Q.  The general suspicion maybe they're criminal tools?

"A.  Correct.

"Q.  You took a tow chain, took a cutting torch, two air hoses, welding hoses, you took just about every piece of tools that were in these—in this garage; didn't you?

"A.  Correct.

"Q.  The general suspicion that maybe that was a chop shop?

"A.  On the face of the tools by themselves, no."

[11] Detective Saggio again testified:

"Q.  You can see a possible scenario, can't you, where a body shop buys a car that's not worth much money and uses the parts of it like the motor and the transmission if they're rebuilding other legitimate cars?

"A.  Not in view of the other activity that was already—

"Q.  In view of your suspicion?

belonging to the defendants but was seized as well. I agree with the court of appeals which concluded: "[C]learly the overriding purpose of the police was to seize everything and anything, and sort it out later."[12]

One of the more egregious "findings of fact" made by the majority is its conclusion, concerning the officers' ordering of tow trucks, that there is no other evidence in the record "that the police knew of any particular incriminating objects [*i.e.*, automobiles] other than the vehicle described in the warrant" before they entered the garage.

Relying on a *daily summary log* of tow truck departures, the majority finds that the police did not intend to tow more than the one vehicle named

---

"A. My suspicion that a car was most likely—

"Q. Most likely. But, there is nothing on that car that shows you that, is it, other than your suspicions?

"A. No.

"Q. You seized that, too?

"A. Correct."

[12] The transcript reveals the following police testimony which further demonstrates the criminal nature was not immediately apparent even to the car theft experts.

"Q. You seized these parts. Then you must have investigated them in relation to these parts for some time?

"A. Yes, I did.

"Q. How long did you hold them before you indicted the Halczyszaks?

"Mr. Gasper: Objection.

"The Court: Objection sustained.

"Q. How long did you hold them before you made any determination as to whether they were stolen or not?

"Mr. Gasper: Objection.

"The Court: He can answer that.

"Mr. Gasper: I didn't hear your ruling on it.

"The Court: I said he can answer that question.

"Mr. Gasper: I'm sorry.

"The Witness: Ball park figure. Detective Powell and Bucey actually—the identification of the parts I'd say four months, three months, four months.

"Q. You seized auto parts based on just a general suspicion, held them for four months before you made any determination on them; is that correct?

"A. Before we actually determined they were stolen, yes.

"Q. You didn't determine they were stolen by any concrete evidence. And by that I mean numbers on them; is that correct?

"A. That's correct."

"* * *

"Q. But, you seized this frame even though there was nothing about it that made it look stolen?

"A. No. I believe that we had three stolen Oldsmobiles.

"Q. So you had three stolen Oldsmobiles. So you seized the Buick frame? Is that what you're telling the court?

"A. The processing of the Buick frame could not be done completely, and we weren't even sure it was a Buick frame.

"Q. So what you're telling this court is rather than go to an independent magistrate and get a warrant, you decided to seize these peoples' [*sic*] property and then check it out?

"A. We decided to seize the property, yes."

in the warrant prior to conducting their exploratory search. In fact, the officers filled out *written requests for four vehicle tows* with a time logged on the requests of 8:10 p.m., ten minutes before they first entered the gate to the premises with the warrant for a single automobile. In this vein, the majority reports that the 1973 Corvette "was first observed by police as they entered the building" to execute the warrant. In actuality, record exhibits demonstrate the officers' intent to seize the car as criminal evidence *before* they initiated the search of the building.[13]

Why the mechanics mysteriously left their tool boxes open (gremlins?); why the police completed *multiple* tow tickets prior to the search when the warrant was for but one vehicle; how a local television news crew knew to show up at the premises for a "chop shop" bust (during which, for the benefit of the viewers, suspect vehicles were shown and a detective explained on camera the manner in which a "chop shop" operates); and why it is odd to find body parts, body tools and cars in need of body services in a body shop, are among the many questions remaining and factual issues ignored or altered in the majority opinion. Is there any wonder why?

I am also concerned with the majority's implicit rejection of the doctrine of *stare decisis.* Since *Brown, supra,* obviously does not compel today's result, and because our holdings in *Williams* and *Wilmoth* are consistent with the Sixth Circuit's post-*Brown* definitions of the "plain view" exception, I see no justification for the majority's failure to apply a settled principle of law in this case.

However, I do admit that a few of the majority's legal observations are somewhat valid and would modify our holdings in *Williams* and *Wilmoth* accordingly. For example, in recognition of recent federal rulings, I believe it is proper to ascertain compliance with the "immediately apparent" requirement based on the expertise of state agents who are qualified as auto theft experts and who are at the scene of the seizure. Based on the agents' past training and experience, the criminal nature of an item may be immediately apparent to such a specialist even though the average police officer may not recognize it as such. I also agree that the criminality of a group of VIN plates removed from vehicles, if discovered inadvertently during a lawful search, could, in some instances, be considered immediately apparent. Similarly, any tools of an intrinsically criminal nature used in auto theft (such as door jimmys or special tools designed to knock out steering and ignition locks) could be seized.

In my opinion, the majority attempts to soften the absurdity of its reasoning, however, by not overruling *Williams* and *Wilmoth* and by

---

[13] The police testified they first cut open the gate and entered the premises at *8:20* p.m. Several tow requests, which are record exhibits, indicate their completion ten minutes before.

See defendants' exhibits D, E, F, and G. (Exhibit F is reproduced herein as Appendix A. See *infra* at 330.)

claiming that it is merely applying the test for the "plain view" exception enunciated in *Brown, Coolidge,* and *Williams.* As the author of this court's decision in *Williams,* I find that today's decision is in fact a *sub silentio* nullification of the holding and reasoning in *Williams* because the instant opinion repudiates most of the important safeguards and standards concerning the "plain view" doctrine. We are left with hollow words which have been redefined in a fashion whereby their significance has been diminished. For example, "inadvertent" now means a discovery made during a deliberate general exploratory search outside the scope of a limited warrant and following its execution.[14] "Immediately apparent" includes property, no matter how facially innocent, which may later be identified as stolen through an intense inquiry following its discovery.[15] Such definitions obviously do not comport with federal precedent nor do they comply with the vital constitutional safeguards against warrantless seizures.

These provisions, which are "* * * expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are *now,* after the lapse of more than * * * [fifteen] years, sought to be avoided." *Ex Parte Milligan* (1866), 71 U.S. (4 Wall.) 120. "[T]hese safeguards need, and should receive, the watchful care of those intrusted with the guardianship of the Constitution and laws. In no other way can we transmit to posterity unimpaired the blessings of liberty, consecrated by the sacrifices of the Revolution." *Id.* at 124.

The majority has selectively chosen threads of fact and law with which

---

[14] Moylan in his article, The Plain View Doctrine: Unexpected Child of the Great 'Search Incident' Geography Battle (1975), 26 Mercer L. Rev. 1047, 1083-1084, perceptively analyzes the history and scope of the entire "plain view" doctrine and states as to the 'inadvertent' requirement:

" 'The evil at which this requirement is aimed is the "planned warrantless seizure." The "inadvertence" requirement is intended simply to prevent the police from using an entry into a "constitutionally protected area" for purposes of making an arrest—or for any other ostensibly legitimate purpose—as a mere subterfuge for a plain view reconnoitering. There may not be a contrived investigatory reconnaissance aimed at evading the warrant requirement for a search or seizure. There may not be a planned plain view.'

"LaFave explains the 'inadvertence' requirement:

" 'Although the point is not dealt with adequately in *Coolidge* it is logical to conclude that what is referred to therein as an "inadvertent discovery" is the finding of evidence which is not "anticipated" at a time when and to a degree that a search warrant naming those items could have been obtained.' 2 W. LaFave, *Search and Seizure,* § 7.5(d)(1978)." *State* v. *Moore, supra,* at 814, fn. 12.

[15] The majority states that "* * * autos are different from accumulations of white powder or plants possessing distinctive leaves or odors." While the majority's perceptiveness is to be commended, its conclusion with respect to connotations of illegal character does not follow. Although automobiles may not always display unlawful characteristics, neither do movie films until viewed (*Stanley* v. *Georgia, supra,* Stewart, J., concurring at 571-572); calendars (*McLernon, supra);* radios (*Harmon, supra);* or a truck (*Manning, supra).* This is the very reason why the intrinsically innocent rifles were suppressed in *Szymkowiak* and *Gray, supra,* yet the seizure of a sawed-off shotgun was upheld in *Truitt, supra.*

it seeks to weave a sailcloth to cloak and preserve its ruling. The resulting shroud, however, is made of whole cloth which fails to protect the opinion from the winds of justice, the storms of truth and the rains of reason.

Accordingly, I would reverse the court of appeals in part and remand the cause to the trial court for further proceedings consistent with *Brown*, in accord with the Sixth Circuit decisions, our past pronouncements and this opinion.[16]

SWEENEY, J., dissenting. By its decision today, the majority has totally emasculated longstanding precedent supporting the people's right to be free from unreasonable searches and seizures, and has, for all practical purposes, jettisoned into uncertainty the Fourth Amendment to the United States Constitution, as well as Section 14, Article I of the Ohio Constitution. Under such deplorable circumstances, I must vigorously dissent from the majority's myopic disposition.

The perilous journey concocted by this ill-conceived majority opinion begins with paragraphs one and two of the syllabus, where mere suspicion on the part of police officers is elevated into constitutionally protected dogma. While such a break with constitutional case law is shocking as well as tragic, the majority continues its assault on the Fourth Amendment by laying waste to the narrow exceptions to the warrant requirement encompassed in the "plain view" doctrine. The "plain view" doctrine delineated in *Coolidge* v. *New Hampshire* (1971), 403 U.S. 443, and adopted by this court in *State* v. *Williams* (1978), 55 Ohio St. 2d 82 [90 O.O.3d 81], was never intended to permit such egregious violations of Fourth Amendment rights as the majority endorses today. In my view, the majority opinion has replaced the "plain view" exception with an "admission ticket" exception to the warrant requirement, whereby the attainment of a search warrant will permit a general exploratory search for any items present on a particular premises, regardless of whether any evidence seized thereunder

---

[16] Judge Markus set forth the following observations in his dissenting opinion to the court of appeals' decision.

"While I agree with the majority that the police exceeded their authority in the challenged search, some items thereby recovered may well have satisfied the 'plain view' exception. For that purpose, evidence which was not identified in the warrant was lawfully seized only if a) the discovery of such items was inadvertent, and b) their incriminating nature was immediately apparent to the seizing authority. The police could not rely on any further investigation, inspection, telephone call, computer check or other procedure to recognize the incriminating nature of the challenged evidence.

"A decision about which items, if any, satisfied that standard for 'plain view' seizures is at least initially a factual determination. The trial court did not apply the proper standard in deciding whether each contested item was properly seized. Therefore, I would remand to the trial court for a separate resolution of this factual issue for each item in contest.

"The trial court should not have made a blanket ruling that all items recovered in this far-reaching search were proper evidence. Similarly, we should not make a blanket decision excluding all items beyond the vehicle identified in the warrant."

is of an incriminating nature. This is precisely the type of conduct we condemned in *State* v. *Wilmoth* (1982), 1 Ohio St. 3d 118, 120, and I see absolutely no reason justifying a change in direction on this fundamental point now.

Given today's holding, the appellant-state will certainly be surprised with the majority's eagerness to apply this relaxed standard, since it argued below that the officers here had more than a mere generalized suspicion upon which to base their further search beyond the scope of the warrant.

Turning to another aspect, I find the majority's attempt to characterize the discovery of alleged incriminating evidence as "inadvertent" defies the logic of its statement concerning "generalized suspicion." It would seem that such a contradiction would be obvious to at least a bare majority of this court, but apparently indifference on the part of my learned brethren has allowed this inconsistency to take place. In my view, no discovery of evidence could possibly be classified as "inadvertent" if the same was buttressed on the generalized suspicion that the potentially incriminating items, unspecified in the warrant, would also be there to be seized.

While perhaps recognizing its unprecedented destruction of Fourth Amendment freedoms, the majority foists a curious rationale which speaks of evidence in terms of whether it was in the "plain sight" of the officers executing the search warrant. Undaunted by its inability to rationalize the illegal search and seizure undertaken here, the majority contorts the "plain view" exception beyond recognition, and manufactures the "plain sight" doctrine out of thin air. Such a judicial "shell game" should not be countenanced by this court. What remains, of course, is that the proverbial exception swallows the rule, at the expense of fundamental constitutional rights.

The danger inherent in the majority's decision is manifest. Decades of abundant jurisprudence have been cast aside with a mere stroke of the pen. The Fourth Amendment and its companion provision in the Ohio Constitution are not a mere "form of words" or surplus verbiage. The framers of both Constitutions were well aware of the abuses undertaken by their one-time oppressors when the former meticulously crafted the requirements underlying the right of the citizenry to be free from unreasonable searches and seizures. Over the years, a central canon of criminal law has been that the rules involved are to be applied in a fair and equal manner in all situations. As noted by this court in *Akron* v. *Williams* (1963), 175 Ohio St. 186, 190 [23 O.O.2d 466]: "* * * The courts must protect the fundamental rights of its citizens even though in doing so the guilty may at times escape punishment. This is the penalty which a free society must pay to protect its freedom. * * *"

Nevertheless, the majority looks at the desired end result, and then justifies the means employed by the officers in order to reach that end.

While I am uncertain that any of my fellow justices who comprise the majority would agree that their legal philosophy embraces this careless mode of reasoning, this is exactly the type of thinking that the majority opinion exalts.

Other aspects of the majority opinion are also troubling. The case relied on so heavily by the majority, *i.e.,* the high court's plurality decision in *Texas* v. *Brown* (1983), 460 U.S. 730, is inapplicable to the instant case, because the detectives herein were not *lawfully* engaged in an activity during the course of their unauthorized exploratory search. The majority opinion further stumbles by relying on the recent case of *New York* v. *Class* (Feb. 25, 1986), ____ U.S. ____, 89 L.Ed. 2d 81. The majority apparently seizes upon *Class* because "VINs" are a subject of discussion therein. However, a close reading of the *Class* decision reveals that it is totally devoid of any applicability to the cause *sub judice.*

All of the foregoing leads me to conclude that once the majority opinion is stripped to its bare essentials, we have a judicially endorsed situation that has been previously and repeatedly condemned by this court over the years. See, *e.g., Williams, supra,* and *Wilmoth, supra.*

I believe that the proper procedure for the officers to have followed under the facts of the instant case is that when they made their observation that the premises entered was a suspected "chop shop," they should have secured the premises and obtained another search warrant in order to lawfully search and seize those items not specified in the original search warrant. Given the state of the record in the cause *sub judice,* I would affirm the decision of the court of appeals which properly suppressed all items seized that were not specified in the search warrant.

In conclusion, I can only hope that the instant case will be summarily ignored as an aberration of law narrowed to its peculiar facts. Nevertheless, I believe that *Williams* and *Wilmoth,* in their original form, stand as beacons of constitutional security as a natural check and balance on the coercive power of the government. As these cases have been "modified" by the majority today they unfortunately become hollow vestiges of enlightened constitutional jurisprudence.

# APPENDIX A

## VEHICLE PROCESSING REQUEST

COMP. NO. _81934_

TIME _2010_ DATE _3-30-82_

TOW UNIT CODE NO. _81934_

LIC. _|_|_|_|_|_|_|_| YR.19 _____ OHIO ☐ STATE

VIN. NO. _1|Z|3|7|J|3|5|4|1|6|2|3|7|_|_|

YEAR OF VEHICLE _1973_ MAKE _Chevrolet_ MODEL _Corvette_ STYLE _2c_ COLOR _Red_

CRIME INVOLVED: _GTMV_ VICTIM: _Progressive Casualty Insurance_ (NAME) _6212 Rockside_ (ADDRESS)

RELEASE ☐ HOLD ☐

TOWED FROM: _3927 Clark_

AFTER PROCESSING _688 8191_ (BADGE #) CAR# _8173_

OFFICERS REQUESTING TOW _Seggio, Det_ (NAME)

TOWED BY TRUCK # _____ DRIVER _____ BADGE # _____ TIME _____

LISTED OWNER OF VEHICLE _Doris Budny_ (NAME) _342_ (BADGE #)

ADDRESS _5630 State # 7_

WITH WHOM FOUND _Czech Craft_ (NAME) ADDRESS _3927 Clark_

A.T.U. NOTIFIED _____ (NAME) _____ (RANK) DET. DIV. NOTIFIED _____ (NAME) _____ (RANK)

DET'S. ASSIGNED: (Name) _____ (Name) _____ (RANK)

PROCESS FOR: Blood (Photo) (Semen) Narc. (Vin.No) (Prints) OTHER _____

EVIDENCE MOST LIKELY FOUND AT: _____

OTHER REMARKS: _CRIMINAL TOOLS_

OTHER PROPERTY FOUND IN CAR: _O_

EXAMINED & APPROVED BY: _____ (NAME) (RANK) _____ (TIME) _8 30 82_ (DATE)

TOWED TO LOT # _____ REC BY: _____ TIME _____

LAB NOTIFICATION VERIFIED _____ (LAB OFFICER) VERIFICATION BY _____ (IMPOUND OFFICER)

PROCESSED BY _____ (NAME) _____ (RANK) _____ (TIME) _____ (DATE)

DIV. OF CRIMINAL INVESTIGATION AUTH. TO RELEASE _____ (NAME) _____ (RANK)

HOW OWNER NOTIFIED TO CLAIM AUTO _____ BY _____ DATE _____

DEFENDANT'S EXHIBIT _E_