[Cite as *State v. Thompson*, 2021-Ohio-3184.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | APPEAL NO. C-200388 |
| | | TRIAL NO. B-1902260 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| | : | |
| TYLON THOMPSON, | | |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  September 15, 2021

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Krista M. Gieske*, Assistant Public Defender, for Defendant-Appellant.

**BERGERON, Presiding Judge.**

{¶1}    A stop sign violation spiraled into the arrest and conviction of defendant-appellant Tylon Thompson for three counts of drug possession.  Now facing a 42 month sentence, Mr. Thompson challenges the denial of his suppression motion, an array of evidentiary determinations, as well as his underlying convictions and sentences.  After reviewing the evidence and record, we overrule all four of his assignments of error and affirm the judgment below.

I.

{¶2}    This case stems from a College Hill traffic stop in August 2019, when Officer Michael Smith observed a black Hyundai Elantra with heavily tinted windows roll through a stop sign at Elkton Place.  Officer Smith pulled the vehicle over and activated his body camera, which captured the entire encounter.  Because of the window tint, he approached the car from the passenger side.  The passenger-side window was rolled down, with Mr. Thompson seated in the passenger seat and his significant other at the wheel.

{¶3}    Officer Smith informed both occupants of the reasons for the stop and asked for identification, which they provided.  As Officer Smith walked back to his cruiser to run the couple's names through his computer, he expressed concern to accompanying officers about movements Mr. Thompson made around the center console of the car as he approached.  Officer Smith's search of the couple's names revealed that the driver was driving under a suspended license, and Mr. Thompson did not have a license. Officer Smith then summoned the nearest drug dog, expressing his belief that Mr. Thompson was concealing drugs in the center console area.

{¶4}    Roughly 17 minutes into the stop, Officer Smith finished writing the citation for the stop sign violation and driving under suspension, delivering it to the driver.  He instructed the driver and Mr. Thompson to "sit tight for a couple more minutes."  For the

next six minutes, Officer Smith chatted with other officers on the scene and with Mr. Thompson. Around 23 minutes into the stop, K-9 handler Officer Michael Bricker arrived on the scene with his dog. Out of Mr. Thompson's earshot, Officer Smith informed Officer Bricker that "he's covering up the whole left side of him and the center console area, so you can't see." He further explained that the couple had just traveled from an area known for drug activity.

{¶5} After conversing with Officer Smith, Officer Bricker explained the drug dog procedure to Mr. Thompson and the driver. Pursuant to a departmental policy dictating that passengers cannot remain in a vehicle during a canine sniff, Officer Bricker opened the car door and ordered the couple out of the vehicle. When Mr. Thompson stood up to exit the car, a plastic baggie containing a white substance became visible in the passenger seat next to the center console. Officers then handcuffed Mr. Thompson, placed him under arrest, and conducted a pat-down and full search of the car. This search revealed $463 of United States currency and raw marijuana wrapped in a dollar bill. At the Hamilton County Justice Center later that day, Mr. Thompson was subjected to a strip search. Police found three small baggies in Mr. Thompson's anal cavity, which ultimately tested positive for a cocaine-methamphetamine compound and fentanyl.

{¶6} The Hamilton County Grand Jury returned a six-count indictment against Mr. Thompson, charging: 1) trafficking in a fentanyl-related compound; 2) possession of a fentanyl-related compound; 3) trafficking in cocaine; 4) possession of cocaine; 5) aggravated trafficking in drugs; and 6) aggravated possession of drugs. Mr. Thompson rejected the state's plea offer and asserted his right to a jury trial.

{¶7} Mr. Thompson moved to suppress the plastic baggie containing a white substance, which the trial court denied. When the case proceeded to trial, the court admitted the raw marijuana seized on the scene over Mr. Thompson's objection

3

(emphasizing the absence of any marijuana-related charges). The trial court also permitted Melissa Sterling, the analyst who tested the substances seized during Mr. Thompson's arrest, to provide expert testimony on her findings. Mr. Thompson again objected, arguing that Ms. Sterling provided an insufficient summary of her expert testimony in contravention of Crim.R. 16(K).

{¶8} The jury found Mr. Thompson not guilty of the three trafficking counts, but guilty of the three possession counts. After reviewing Mr. Thompson's pre-sentence investigation, the trial court imposed maximum, consecutive sentences for an aggregate term of 42 months' incarceration.

## II.

{¶9} Mr. Thompson now appeals from his convictions, asserting four assignments of error. He challenges 1) the denial of his motion to suppress, 2) the admission of the raw marijuana and Ms. Sterling's expert testimony, 3) the convictions as against the manifest weight of the evidence, and 4) the imposition of maximum, consecutive sentences.

## A.

{¶10} Mr. Thompson's first assignment of error challenges the denial of his motion to suppress the plastic baggie containing a white substance that became visible as he exited the vehicle. Our review of a motion to suppress "presents a mixed question of law and fact. We must accept the trial court's findings of fact as true if competent, credible evidence supports them. But we must independently determine whether the facts satisfy the applicable legal standard." *State v. Taylor*, 174 Ohio App.3d 477, 2007-Ohio-7066, 882 N.E.2d 945, ¶ 11 (1st Dist.). However, we consider "whether the facts satisfy the applicable legal standard" de novo. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

4

{¶11} In general, "warrantless searches are per se unreasonable." *State v. Bacher*, 170 Ohio App.3d 457, 2007-Ohio-727, 867 N.E.2d 864, ¶ 8 (1st Dist.). *See State v. Ward*, 2017-Ohio-8141, 98 N.E.3d 1257, ¶ 13 (1st Dist.). But myriad exceptions to the warrant requirement have evolved over the years, and in this case the parties debate whether the plain view exception justified the warrantless search and seizure of the plastic baggie.

1.

{¶12} When the United States Supreme Court first articulated the plain view exception in *Coolidge v. New Hampshire*, it prescribed "a three-part analysis. First, the initial intrusion that brought the police into a position to view the object must have been legitimate. Second, the police must have inadvertently discovered the object. Third, the incriminating nature of the object must have been immediately apparent." *State v. Halczyszak*, 25 Ohio St.3d 301, 303, 496 N.E.2d 925 (1986), citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Ohio adopted this three-part analysis in *State v. Williams*, 55 Ohio St.2d 82, 84, 377 N.E.2d 1013 (1978).

{¶13} By 1990, however, the United States Supreme Court refined the *Coolidge* test—specifically regarding the inadvertence requirement. *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Emphasizing that the *Coolidge* inadvertence requirement commanded only a plurality of the justices, *Horton* held that "even though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition." *Id.* at 130, 136.

{¶14} Although one does not have to look too far to find Ohio cases continuing to cite *Coolidge*, we clarify that, pursuant to *Horton*, the Fourth Amendment does not impose an inadvertence requirement in the plain view analysis under the United States

Constitution.[1] We therefore reject Mr. Thompson's argument that, in this case, the plain view exception under the United States Constitution is not met because the discovery of the contraband was not inadvertent.

{¶15} Given that federal law does not require inadvertence and that Mr. Thompson did not timely raise arguments under the Ohio Constitution, we are left with a two-prong plain view analysis here under *Horton*. The warrantless search of Mr. Thompson satisfies the plain view exception if: 1) the initial intrusion bringing the officer into a position to view the object was legitimate, and 2) the incriminating nature of the object was immediately apparent. Mr. Thompson does not contest the immediately incriminating nature of the plastic baggie containing a white substance, which confines our review to the legitimacy of the initial intrusion bringing the officer into a position to view the object. For the intrusion to be legitimate in this case, the police must have 1) lawfully extended the initial traffic stop, and 2) lawfully ordered Mr. Thompson out of his vehicle.

2.

{¶16} The parties agree that Officer Smith's initial traffic stop of Mr. Thompson's vehicle was justified, and that Officer Smith could permissibly retain him and the driver for as long as necessary to prepare the citation. But Mr. Thompson protests that Officer Smith unlawfully extended the traffic stop beyond that limited time window. *See Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842. ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."). In other words,

---

[1] In his reply brief, Mr. Thompson makes a passing argument regarding the Ohio Constitution. It is too late in the day to advance that argument on reply, and thus we have no occasion to explore any potential distinctions between the inquiry under the Ohio and federal Constitutions. *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 179, quoting *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 18 (" 'Appellate courts generally will not consider a new issue presented for the first time in a reply brief.' ").

an officer cannot orchestrate a four-corners offense on the hopes that reasonable suspicion or probable cause will eventually emerge.

{¶17} In general, to determine the reasonableness of the extension of a traffic stop, "our inquiry is a dual one—[we ask] whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See State v. Bobo*, 37 Ohio St.3d 177, 178, 524 N.E.2d 489 (1988). If a traffic stop is extended past the time reasonably required to prepare the citation, "the question then becomes whether the officer had a reasonable, articulable suspicion that the vehicle contained drugs or that the occupant was engaged in a drug-related activity at that time." *Ohio v. Skaggs*, 3d Dist. Crawford No. 3-20-13, 2021-Ohio-2803, ¶ 17, citing *State v. Lawler*, 2020-Ohio-849, 152 N.E.3d 962, ¶ 36 (3d Dist.) ("It is well established that if a law enforcement officer has a reasonable, articulable suspicion that a vehicle contains drugs or that the vehicle's occupants are engaged in drug-related activity, the officer may detain the vehicle and its occupants beyond the time reasonably necessary to complete the traffic-related investigation in order to allow a drug-detection dog to be brought to the scene."). Since the parties agree that the officer's action was justified at its inception, and the state acknowledges that the traffic stop extended beyond its initial purpose, the only question is whether "additional facts [were] encountered that [gave] rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop." *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 15.

{¶18} The state points to four factors supporting a reasonable, articulable suspicion justifying the extension of the stop: 1) Mr. Thompson's "furtive movements" toward the center console as Officer Smith approached the car (consistent with efforts to conceal contraband or possibly a weapon); 2) Mr. Thompson's alleged chattiness during the stop,

contrasted with the silence and apparent nervousness of the driver; 3) Mr. Thompson's tendency to lean forward and over the center console area when speaking with Officer Smith; and 4) the location of the stop in a high-crime area known for drug trafficking.

{¶19} Mr. Thompson contests Officer Smith's account of "furtive movements," insisting that the body camera footage demonstrates that the officer could not have seen into the car as he approached. He further points out that many people are nervous when interacting with police officers, and that silence or nervous discourse are both perfectly reasonable responses to this anxiety. Finally, he asserts that presence in a high crime area is simply not enough to justify the continued detention.

{¶20} Mr. Thomson is correct that "simply being in a 'high crime' area is 'not sufficient to justify an investigative stop. To hold otherwise would result in the wholesale loss of the personal liberty of those with the misfortune of living in high crime areas.' " *State v. Ward*, 2017-Ohio-8141, 98 N.E.3d 1257, ¶ 19 (1st Dist.), quoting *State v. Carter*, 69 Ohio St.3d 57, 65, 630 N.E.2d 355 (1994). *State v. Ferrante*, 196 Ohio App.3d 113, 2011-Ohio-4870, 962 N.E.2d 383, ¶ 26 (2d Dist.) (" '[A]cts that are essentially neutral or ambiguous,' " like nervous chatting or silence, " 'do not become specifically criminal in character because they occur in a high crime area.' "), quoting *State v. Maldonado*, 2d Dist. Montgomery No. 13530, 1993 WL 402772, *4 (Sept. 24, 1993). And "[f]urtive movements alone are not sufficient to justify the search of an automobile without a warrant." *State v. Kessler*, 53 Ohio St.2d 204, 208, 373 N.E.2d 1252 (1978).

{¶21} However, each of the factors that contributed to Officer Smith's suspicions are recognized as legitimate considerations that—when combined—can justify a reasonable suspicion conclusion. *See Bobo*, 37 Ohio St.3d at 179, 524 N.E.2d 489 (" 'The reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely in determining whether an investigative stop is warranted.' "), quoting

8

*United States v. Magda*, 547 F.2d 756, 758 (2d Cir.1976); *Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, at ¶ 19 ("nervous interaction" and "tinted windows," along with other factors, supported reasonable suspicion). *See also United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("A determination that reasonable suspicion exists * * * need not rule out the possibility of innocent conduct."). And Ohio courts have recognized, under analogous circumstances, the permissible extension of a traffic stop upon a consideration of multiple factors generating reasonable suspicion. *See State v. Howard,* 12th Dist. Preble Nos. CA2006–02–002 and CA2006–02–003, 2006-Ohio-5656, ¶ 23-26 (during 14 minute episode, trooper "encountered additional facts which gave him a reasonable, articulable suspicion that * * * [defendants] were engaged in criminal behavior," including inconsistent or illogical statements by both passengers and the female passenger's sudden (and in the officer's view, disingenuous) complaint of menstrual cramps).

{¶22} The body camera footage also supports the state's argument. Although Mr. Thompson depicts the windows of the car as too dark for Officer Smith to witness any reaching toward the center console as he approached, the passenger window was down, enabling Officer Smith to see inside (both directly and through the side mirror). And this footage aligns with the officer's testimony, even though it does not disclose the precise nature of the furtive movements.

{¶23} Once we combine these furtive movements with Mr. Thompson's nervous behavior, movements about the center console, and presence in a high drug trafficking area, we believe that sufficient evidence existed to support a reasonable, articulable suspicion of drug activity. Although "none of the individual factors taken alone would provide reasonable, articulable suspicion for delaying the traffic stop," "when taken as a whole, they could be found to provide a reasonable, articulable suspicion." *Skaggs*, 3d Dist. Crawford

No. 3-20-13, 2021-Ohio-2803, at ¶ 22. In light of the trial court's ruling and the record at hand, we find that the extension of the initial traffic stop did not violate Mr. Thompson's federal constitutional rights.

3.

{¶24} Next, Mr. Thompson argues that even if the officer could legitimately extend the stop, he could not order Mr. Thompson out of the vehicle. If ordering Mr. Thompson out of the vehicle represented an unreasonable search or seizure, then the immediate result of the order—the contraband that emerged in plain view—would be excluded as "fruit of the poisonous tree." *See State v. Warren*, 129 Ohio App.3d 598, 606, 718 N.E.2d 936 (1st Dist.1998). Alternatively, Mr. Thompson argues that even if the officer could lawfully take that step, any contraband revealed as Mr. Thompson exited the vehicle was not in plain view.

{¶25} There is little question that if Officer Smith had ordered Mr. Thompson out of the vehicle immediately upon making the traffic stop, this would not raise constitutional alarm. In *State v. Evans*, the Ohio Supreme Court followed the United States Supreme Court's decision in *Pennsylvania v. Mimms* to hold that "a police officer may order a motorist to get out of a car, which has been properly stopped for a traffic violation, even without suspicion of criminal activity." *State v. Evans*, 67 Ohio St.3d 405, 407, 618 N.E.2d 162 (1993), citing *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). *See State v. Leonard*, 1st Dist. Hamilton No. C-060595, 2007-Ohio-3312, ¶ 16 (where police officer had lawfully stopped a driver for a window-tint violation, he could order the driver to get out of his van).

{¶26} Complicating this case is the fact that the initial purpose of the stop—to issue a citation for a stop sign violation and driving under suspension—was already accomplished when the officer ordered Mr. Thompson out of his vehicle (i.e., a *Mimms* order). Mr.

Thompson maintains that, under these circumstances, and because the *Mimms* decision was grounded in officer safety, a threat to officer safety is necessary to support a *Mimms* order.

{¶27} On the contrary, the Ohio Supreme Court has held that "*Mimms* merely dispenses with the requirement that the police officer possess reasonable suspicion of criminal activity before the officer may order the driver out of an already lawfully stopped vehicle." *Evans* at 408. So long as a motor vehicle is "already lawfully stopped," a police officer may make a *Mimms* order without reasonable suspicion, a threat to officer safety, or any other prerequisite. *Id.* ("Unlike an investigatory stop, * * * a *Mimms* order does not have to be justified by any constitutional quantum of suspicion."), citing *Terry*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889. This is because where "police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it." *Evans* at 407. *Compare id.* at 408, quoting *Terry* at 24 ("[A] protective search of the detainee's person for concealed weapons is justified only when the officer has reasonably concluded that 'the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others * * * .""). Because a *Mimms* order is a "minimal and insignificant * * * intrusion," unlike a pat-down search or investigatory stop, if a motor vehicle has been lawfully stopped, an officer needs no additional justification to order the individual out of the vehicle. *Evans* at 408. Since we have already decided that Mr. Thompson's vehicle was lawfully stopped, and the stop was lawfully extended because of reasonable suspicion of drug activity, the officer could make a *Mimms* order without additional justification.

{¶28} Mr. Thompson also contends, in the alternative, that any contraband revealed as he exited his vehicle could not be seized under the plain view exception. The facts of this

11

case bear similarities to *State v. Jackson*, 1st Dist. Hamilton No. C-190676, 2021-Ohio-517, which we recently decided. In that case, officers opened the defendant's driver's side door and ordered him out. *Id.* at ¶ 6. Instead of closing the door after the driver exited the car, the officer shone a flashlight inside the car, revealing a marijuana cigarette resting on the floor below the driver's seat. *Id.* at ¶ 7. We rejected the driver's claim that "because the police ordered him out of the car and the police officers left the car door open, the marijuana cigarette was not in plain view," labeling it "a distinction without a difference." *Id.* at ¶ 17.

{¶29} The Ohio Supreme Court subsequently accepted *Jackson* for review on the following two propositions of law: 1) an officer's act of opening a driver's door and ordering the driver to step outside the vehicle constitutes a search under the Fourth Amendment and Article I, Section 14 of the Ohio Constitution, and 2) after a driver is asked to step out of the vehicle, the responding officer must have an independent justification to search the interior of the vehicle in order for an item to be properly observed in plain view. Needless to say, the Supreme Court's forthcoming decision certainly could impact our present analysis. But under our current precedent, Mr. Thompson's argument fails.

{¶30} We find that Mr. Thompson was lawfully ordered out of his vehicle and that any contraband revealed as he exited his vehicle was in plain view. We therefore overrule Mr. Thompson's first assignment of error in full.

B.

{¶31} Next, Mr. Thompson argues that the trial court committed evidentiary errors that deprived him of his constitutional rights. The admission of evidence sits "within the broad discretion of the trial court and subject to review on an abuse-of-discretion standard." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19. We will find that a trial court abused its discretion if it "act[ed] unreasonably, arbitrarily, or

unconscionably in determining the evidentiary issue at hand." *State v. O'Connell*, 2020-Ohio-1369, 153 N.E.3d 771, ¶ 14 (1st Dist.). However, "[w]e will not disturb a trial court's ruling on evidentiary issues on appeal absent an abuse of discretion and proof of material prejudice." *State v. Lavender*, 2019-Ohio-5352, 141 N.E.2d 1000, ¶ 9 (1st Dist.).

1.

{¶32} Mr. Thomas challenges the admission of the marijuana seized during the stop under Evid.R. 404(B) and R.C. 2945.59, which "preclude admission of other acts evidence to prove a character trait in order to demonstrate conduct in conformity with that trait." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 16, citing *State v. Lowe*, 69 Ohio St.3d 527, 530, 634 N.E.2d 616 (1994), and *State v. Hector*, 19 Ohio St.2d 167, 174, 249 N.E.2d 912 (1969). Noting that he was not charged with any marijuana-related offenses, Mr. Thompson insists that the state admitted the raw marijuana solely to paint a portrait of him as a prolific drug dealer.

{¶33} To be sure, "[e]vidence of other acts may not be used to prove by inference that the accused acted in conformity with those other acts or that he has a propensity to act in that way." *State v. Worley*, Slip Opinion No. 2021-Ohio-2207, ¶ 118, citing Evid.R. 404(B). We have recently explained that " 'Evid.R. 404(B) exists to guard against the "propensity" inference—in other words, wielding past bad acts to prove action in conformity therewith, which facilitates a conviction based on prior conduct rather than the evidence at hand.' " *State v. McDaniel*, 2021-Ohio-724, 168 N.E.3d 910, ¶ 15 (1st Dist.), quoting *State v. O'Connell*, 2020-Ohio-1369, 153 N.E.3d 771, ¶ 1 (1st Dist.). However, "Evid.R. 404(B) does permit the admission of other acts for limited purposes 'such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' " *McDaniel* at ¶ 15, quoting Evid.R. 404(B).

13

{¶34} Although the state does not clearly articulate how the admission of this evidence comports with Evid.R. 404(B), we need not decide whether Evid.R. 404(B) and R.C. 2945.59 preclude admission of the marijuana. Even if the admission of the state's marijuana exhibits constituted error, we could only reverse the conviction if we found that the error was not harmless error. *O'Connell* at ¶ 31. *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").

{¶35} Mr. Thompson's trial counsel stipulated to the admission of body camera footage, which shows the police's recovery of raw marijuana from inside the vehicle. The marijuana is clearly visible in the video and the officers speak with each other about finding it. The admission of the video (without any redactions or edits) ensured that the jury would learn that Mr. Thompson possessed marijuana at the time of the stop. Since the jury appreciated the presence of marijuana on the scene through properly-admitted evidence, we find that the admission of the raw marijuana, if erroneous, would constitute harmless error on this record. In other words, it did not tell the jury anything that it did not already know. Moreover, the marijuana evidence posed a risk that the jury would convict Mr. Thompson for the trafficking offenses, but of course it acquitted him on those charges.

2.

{¶36} Next, Mr. Thompson argues that the trial court erred by permitting Ms. Sterling, the Hamilton County Crime Lab drug analyst who tested and identified the substances recovered during Mr. Thompson's arrest, to present expert testimony without providing an adequate pretrial expert report. Under Crim.R. 16(K), expert witnesses "shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications." The Ohio Supreme Court dictates that "the plain language of Crim.R. 16(K) limits the trial court's discretion and provides its own specific remedy for a violation of the rule," namely,

14

that the expert testimony is inadmissible. *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 54-55; *State v. Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985, ¶ 11, *appeal not allowed,* 157 Ohio St.3d 1485, 2019-Ohio-4600, 134 N.E.3d 204 ("Providing the report in advance of trial affords the opposing party an opportunity to secure its own expert in response, but even if it elects not to do that, it may well consult with an expert on how to best cross-examine the other side's expert.").

{¶37} The key dispute in this case centers on whether the "Official Crime Laboratory Report" provided by the state satisfied Crim.R. 16(K). The report, which is one page in length, describes the four "specimens" tested by Ms. Sterling. It records the weight of each specimen and lists the substances identified, which include a cocaine-methamphetamine compound, cocaine, marijuana, and fentanyl.

{¶38} Mr. Thompson argues that this cursory summary of data should not be considered a Crim.R. 16(K) report. We disagree. Ms. Sterling's expert opinion was confined to describing and identifying the four substances she tested; her report reflects all of this information. This case is unlike *Hall*, where the state sought to use a detective's investigatory report to satisfy Crim.R. 16(K). *Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985, at ¶ 12. We held that the investigatory report did not satisfy Crim.R. 16(K) because "a world of difference exists between an *investigatory* report ('I observed this during my investigation') and an *expert* report ('I'm qualified as an expert and here are my opinions')." (Emphasis sic.) *Id.* Ms. Sterling's report contains her opinions classifying the recovered substances; it's not just a recounting of her personal observations. This case is also unlike *Davis*, where we found that an expert exceeded the scope of a toxicology report by testifying on the effects of a drug on driving ability. *State v. Davis*, 1st Dist. Hamilton No. C-190302, 2021-Ohio-1693, ¶ 74-75. Ms. Sterling's testimony was

limited to classifying the substances she analyzed, not the effect these substances have on a person who ingests them.

{¶39} Accordingly, we find that Ms. Sterling's report complied with Crim.R. 16(K) and overrule Mr. Thompson's second assignment of error.

C.

{¶40} Turning to Mr. Thompson's third assignment of error, Mr. Thompson asserts that his convictions are against the manifest weight of evidence. When we review a challenge to the manifest weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We will reverse the trial court's decision to convict and grant a new trial only in " 'exceptional cases in which the evidence weighs heavily against the conviction.' " *State v. Sipple*, 2021-Ohio-1319, 170 N.E.3d 1273 ¶ 7, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶41} Mr. Thompson attempts to portray the record of the state's various drug exhibits as contradictory, conjuring a dispute over whether the bags admitted into evidence actually were recovered from the vehicle or his person. But scrutiny of the record does not bear this out. The purported "mix-up" around state's exhibit 4A never occurred. Officer Smith consistently testified that exhibit 4A was retrieved from Mr. Thompson's anal cavity, while exhibit 5A was retrieved from the Elantra. Officer Smith did not know whether exhibit 5A ultimately tested positive for cocaine or for cocaine-methamphetamine, because he did not conduct the testing. Ms. Sterling later clarified that exhibit 5A was labeled exhibit 2-1 on her lab report, which she identified as cocaine. Exhibit 4A corresponded with exhibit 1-1 on the lab report, which Ms. Sterling identified as cocaine-methamphetamine.

{¶42} Mr. Thompson also complains that the methamphetamine in exhibit 4A must have been introduced from Officer Smith's sweep of the back of his cruiser, because he believed that the powder from the sweep was tested at the laboratory. However, this is not

necessarily the case—and even if it is, it does not rebut the state's assertion that Mr. Thompson possessed methamphetamine. Ms. Sterling testified that exhibit 4A contained two "specimens," one smaller and one larger. She tested only the larger specimen, because "if something is not going to get over the next weight threshold, we do not analyze further * * * [t]he charges are based on weight." It is possible that the sweepings from Officer Smith's car made it into exhibit 4A as the smaller substance (and thus were not tested), or that they never made it to testing at all (and both specimens in exhibit 4A were recovered from Mr. Thompson's anal cavity). Either way, the substance tested was fairly attributable to Mr. Thompson.

{¶43} Finally, Mr. Thompson asserts that "slipshod handling and repackaging of the evidence" undercut the credibility of Ms. Sterling's identification. But this argument is unsupported by the record. Ms. Sterling testified that the drugs were re-packaged because the packaging they arrived in was insecure or contaminated with bodily fluids. She explained how the re-packaging occurred and how the state's cross-referencing system worked. The cross-referencing was a source of some confusion at trial, but not to an extent that "weighs heavily against conviction." *See Sipple*, 2021-Ohio-1319, 485 N.E.2d 717, at ¶ 7.

{¶44} We find that Mr. Thompson has failed to demonstrate that the evidence weighs heavily against conviction. We, thus, overrule Mr. Thompson's third assignment of error.

D.

{¶45} For Mr. Thompson's fourth assignment of error, he asserts that 1) the trial court erred in failing to impose community control and 2) the trial's imposition of consecutive sentences was improper.

1.

**{¶46}** We review criminal sentences "under the standard set forth in R.C. 2953.08(G)(2)." *State v. Conley*, 1st Dist. Hamilton No. C-200144, 2021-Ohio-837, ¶ 20. Pursuant to R.C. 2953.08(G)(2), we "may increase, reduce or otherwise modify a sentence, or may vacate the sentence and remand the matter to the sentencing court for resentencing, if the court clearly and convincingly finds that (1) the record does not support the sentencing court's findings under R.C. 2929.13(B) or other relevant statutes, or (2) if the sentence is contrary to law." *Id.*, citing R.C. 2953.08(G)(2)(a).[2] However, the Ohio Supreme Court recently clarified that R.C. 2953.08(G)(2)(a) "does not provide a basis for an appellate court to modify or vacate a sentence if it concludes that the record does not support the sentence under R.C. 2929.11 and 2929.12." *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 31. A sentence may be modified or vacated under R.C. 2953.08(G) only if it implicates one of the enumerated provisions in R.C. 2953.08(G)(2)(a) or is "otherwise contrary to law." *Id.*

**{¶47}** Mr. Thompson's argument that the court should have imposed community control directly parallels the argument we recently rejected in *Conley*. In that case, the defendant was convicted of aggravated possession of drugs and sentenced to the maximum 12 months of incarceration. *Conley* at ¶¶ 9, 21. He argued that "the trial court failed to properly consider the statutory sentencing factors under R.C. 2929.11 and 2929.12." *Id.* at ¶ 24. After concluding that "the record d[id] not demonstrate that the trial court failed to consider the statutory factors," we cited *Jones* for the proposition that "we are not permitted to independently weigh the statutory sentencing factors in R.C. 2929.11 and 2929.12" and upheld the maximum sentence. *Id.* at ¶ 25.

---

[2] Mr. Thompson previously served a prison sentence, rendering R.C. 2929.13(B)'s presumption of community control inapplicable here.

{¶48} Here, the trial court explicitly stated that it had considered "all the sentencing factors under 2929 of the Ohio Revised Code." It noted Mr. Thompson's criminal record, which included prior convictions for illegal possession of drugs, disorderly conduct, possession of heroin, possession of cocaine, obstructing official business, weapons under disability, criminal damaging, aggravated possession of drugs, and domestic violence. It also found that Mr. Thompson "did not step up and take responsibility * * * [for having] drugs on [him] in a body cavity." Given these statements, the record does not demonstrate a failure by the trial court to consider the statutory factors.

2.

{¶49} Mr. Thompson also contests the trial court's imposition of consecutive sentences. He concedes that the court made the required findings under R.C. 2929.14(C)(4), but argues that the record does not contain sufficient evidence to support them. The record does not bear out Mr. Thompson's consecutive sentences challenge. The trial court made the required R.C. 2929.14(C)(4) findings and explained its decision, stating: "The offender's criminal history shows the need to protect the public. Quite frankly, the record is not good." We see nothing in the record to create any issues with the imposition of consecutive sentences, and accordingly we overrule Mr. Thompson's fourth assignment of error.

III.

{¶50} For all of the foregoing reasons, we overrule all four of Mr. Thompson's assignments of error and affirm the judgment of the trial court.

Judgment affirmed.

CROUSE, J., concurs.
BOCK, J., concurs separately.

19

**BOCK, J.**, concurring separately.

{¶51}   I respectfully concur in Judge Bergeron's opinion because I believe that Mr. Thompson's behavior—namely, his furtive movements, nervousness, and attempts to hide the center console of the car—justified the extended stop.  But I write separately to discuss courts' review of "high-crime areas"—one of the factors that the state cited to justify Mr. Thompson's extended stop.

{¶52}   "[L]abeling an area 'high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling."  *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir.2006).  And unfortunately, research suggests that the "high crime" label is more likely invoked when stopping young Black males.  *See* Ben Grunwald & Jeffrey Fagan, *The End of Intuition-Based High-Crime Areas*, 107 Calif.L.Rev. 345, 351 (2019).

{¶53}   While any bias may be unconscious, it is nevertheless vital to take steps to avoid discrimination and racial profiling.  As such, courts should engage in meaningful judicial review before accepting the state's claim that an area is "high crime."  I believe that courts should develop a framework to rigorously review the "high-crime area" designation.

## Reasonable Suspicion

{¶54}   To justify an investigative stop and temporary detention of a person under the Fourth Amendment and Article I, Section 14 of the Ohio Constitution, an officer must point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that" stop. *State v. Carter*, 69 Ohio St.3d 57, 64, 630 N.E.2d 335 (1994), quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A seizure requires a "particularized and objective basis," not general suspicions or inchoate hunches. *Ornales v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 18 L.Ed.2d 134 (1996).

**High-Crime Areas**

{¶55} This court and the Supreme Court of Ohio have recognized that an area's reputation "for criminal activity is an articulable fact upon which a police officer may legitimately rely" to justify an investigative stop. *State v. Ward*, 2017-Ohio-8141, 98 N.E.3d 1257, ¶ 9 (1st Dist.), quoting *State v. Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988). While officers may rely on it as a factor, this court has cautioned against a person's presence in a "high-crime area" as a sole justification for an investigative stop to prevent subjecting the community to wholesale deprivations of constitutional rights. *Id.*, citing *State v. Carter*, 69 Ohio St.3d 57, 65, 630 N.E.2d 355 (1994).

{¶56} Despite decades of use in suppression hearings, the "high-crime area" designation remains undefined and an increasingly malleable factor. At least one article suggests that courts rarely question whether the label is grounded in any objective, verifiable, or factual evidence. Andrew Guthrie Ferguson & Damien Bernache, *The "High-Crime Area" Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis*, 57 Am.U.L.Rev. 1587, 1590 (2008). And while police have used crime-mapping technology for years, few courts request the empirical data, crime maps, or analyst reports substantiating the designation. Andrew Guthrie Ferguson, *Crime Mapping and the Fourth Amendment: Redrawing "High-Crime Areas,"* 63 Hastings L.J. 179, 198 (2011). Thus, while the evidence exists to support the "high-crime area" designation, that evidence evades any judicial review.

## 1. High-Crime Areas and Particularity

{¶57} When reasonable suspicion is based on particularized evidence of a high-crime area—for example, when a defendant is loitering outside of a house in which law enforcement has verified that its occupants are engaged in drug trafficking—it enhances

judicial review of police decisions and narrows the category of "stop-eligible" people in a "high crime" neighborhood. But when the "high crime" label is more imprecise—such as when it is used to characterize neighborhoods or streets—entire sectors of an urban community fall within that designation. Kristin Henning, *The Reasonable Black Child: Race, Adolescence, and the Fourth Amendment*, 67 Am. U.L.Rev. 1513, 1559 (2018).

{¶58} Recently, Ohio's Sixth Appellate District warned that, absent any particularized evidence, "officers patrolling in high crime areas would be given carte blanche to stop" any individual, which "would encourage the arbitrary exercise of law enforcement power, and usher in something akin to 'Fourth-Amendment-free zones' in certain locations." *State v. Mosby*, 6th Dist. Lucas No. 20-1010, 2021-Ohio-2255, ¶ 34, fn. 1.

{¶59} Often, law-abiding people—as well as their family and friends—do not have the financial ability to choose where to live. As such, many law-abiding people are forced to live in neighborhoods with higher crime rates. Narrowing the scope of "high-crime areas" to specific locations in which crimes recently have occurred will help to ensure that people are not stopped based on where they live or visit.

## 2. High Crime Areas and Articulable Facts

{¶60} A general assertion of a "high-crime area" as a factor for suspecting unlawful activity, without more, dispenses with the Fourth Amendment's requirement that facts must be articulable. Rather, there must be an " 'objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). And reasonable suspicion demands a fact-intensive review. *Ornales*, 517 U.S. at 703, 116 S.Ct. 1657, 18 L.Ed.2d 134. In other words, there should be a nexus between the crimes that have occurred at the specific location and the criminal behavior in which police suspect the person is involved.

**{¶61}** But the lack of "consistent and reproducible guidance for courts or the police" creates an inconsistent body of law where different people's behavior in a high-crime area leads to substantially different outcomes. Margaret Raymond, *Down on the Corner, Out in the Street: Considering the Character of the Neighborhood in Evaluating Reasonable Suspicion*, 60 Ohio St.L.J. 99, 121, 124 (1999). Courts should provide such guidance.

<u>**Reviewing "high-crime area" designation**</u>

**{¶62}** A few courts have provided some guidance for examining whether the state properly relied upon the "high-crime area" designation to justify an investigative stop.

**{¶63}** The United States Court of Appeals for the Ninth Circuit instructed that "citing an area as 'high crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." *United States v. Montero–Camargo*, 208 F.3d 1122, 1138 (9th Cir.2000). It instructed district courts to carefully examine police testimony, conduct a fair and honest evaluation of the evidence, and carefully ensure that the "high-crime area" designation "is limited to specific, circumscribed locations where particular crimes occur with unusual regularity." *Id.*

**{¶64}** The United States Court of Appeals for the First Circuit requires courts to consider 1.) a nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the case, 2.) a limited geographic boundary of the area or neighborhood evaluated, and 3.) a temporal proximity between the evidence of criminal activity and the date of the search at issue. *United States v. Wright*, 485 F.3d 45, 54 (1st Cir.2007). An Illinois court analyzed these same factors in determining whether a location was a high-crime area. *People v. Foreman*, Ill.App. No. 5-15-0017, 2016 WL 769517, ¶ 13 (Feb. 26, 2016).

{¶65} Likewise, New York and Indiana courts have required a nexus between the possibility that some crime might have occurred in the area and articulable facts leading the police officer to believe that the defendant was involved in similar crime. *People v. McIntosh*, 96 N.Y.2d 521, 527, 730 N.Y.S.2d 265, 755 N.E.2d 329 (2001) ("it has been crucial whether a nexus to conduct existed, that is, whether the police were aware of or observed conduct which provided a particularized reason to request information."); *Webb v. State*, 714 N.E.2d 787, 789 (Ind.App.1999) (state's argument that the defendant's presence in a high-crime area supported a reasonable inference that he was engaged in criminal activity "lack[ed] a nexus between the very real possibility that some crime might have been occurring in the area and the necessary articulable facts from [the officer] leading him to believe that [defendant] was involved in a crime.").

{¶66} This court correctly holds that a "high-crime area" may be one of several factors justifying an investigative stop. But I believe we must strengthen our review of the "high-crime area" designation because, as stated by the Sixth Circuit, the "special concerns of racial, ethnic, and socioeconomic profiling" arise when designating an area "high crime." *Caruthers*, 458 F.3d at 467.

Please note:

    The court has recorded its entry on the date of the release of this opinion