[Cite as *State v. Hyatt*, 2024-Ohio-2422.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230623 |
| | | TRIAL NO. B-2300678-B |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | | *O P I N I O N.* |
| | : | |
| KRISTEN HYATT, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 26, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson*, Assistant Public Defender, for Defendant-Appellant.

**BERGERON, Judge.**

{¶1} A wellness check prompted by a report that defendant-appellant Kristen Hyatt was suicidal after ingesting too much of her medication ultimately resulted in a two-count indictment of drug-related charges after the responding officers discovered syringes, marijuana, and two bags of a crystallized substance (later determined to be methamphetamine) among her bathroom, purse, and living room. Ms. Hyatt attempted to suppress the evidence, insisting that the officers exceeded the scope of a wellness check and that the plain view exception did not justify the searches. The trial court disagreed, denying her motion, and she now appeals. After carefully reviewing the evidence and the record, we overrule Ms. Hyatt's sole assignment of error and affirm the trial court's judgment.

I.

{¶2} In the early morning hours in February 2023, Sergeant Ian Courtney of the Cheviot Police Department responded to a report of a suicidal woman who had allegedly ingested too much medication. The 911 caller, Ms. Hyatt's boyfriend, John Whittle, answered the door and invited Sergeant Courtney inside. Mr. Whittle shared his concern for Ms. Hyatt's safety because she had taken too much of her prescription medication and was "acting crazy."

{¶3} Mr. Whittle directed Sergeant Courtney upstairs where the officer located Ms. Hyatt in an upstairs bedroom directly opposite the top of the stairs. The remainder of the upstairs of the home consisted of a bathroom to the right of the stairs and a second bedroom to the left. The door to the second bedroom was closed when Sergeant Courtney arrived.

**{¶4}**   Sergeant Courtney spoke with Ms. Hyatt, who explained that she had been arguing with Mr. Whittle that day.  She admitted that she threatened to kill herself because she felt that he was holding her hostage by withholding her phone.  She shared other statements that raised potential domestic violence concerns.  But she denied ingesting medication, assuring Sergeant Courtney that she did not wish to harm herself.  Ms. Hyatt's purse rested on the bed during their conversation, and at one point, she picked up her purse, retrieving the empty medication bottle to show him that if she took the medication as prescribed, the bottle would contain only one pill.

**{¶5}**   During the exchange between Sergeant Courtney and Ms. Hyatt, Corporal Joey Carter of the Green Township Police Department arrived on the scene, responding to Sergeant Courtney's earlier request for assistance.  Paramedics also arrived pursuant to the police department's standard procedure for matters involving potential self-harm.  After a brief exchange with Mr. Whittle, Corporal Carter went upstairs, stopping in the bathroom where he scanned the room with his flashlight.  At this time, he spotted a syringe in the trashcan.  He informed the paramedics of the syringe.

**{¶6}**   With the paramedics evaluating Ms. Hyatt, Sergeant Courtney returned downstairs to speak with Mr. Whittle.  As he was standing near the bottom of the staircase, he spotted a baggie of a crystalized substance on the coffee table in the living room and a syringe filled with liquid on the floor next to the table.  In response to Sergeant Courtney's questioning, Mr. Whittle initially denied that the baggie was his, but he eventually admitted that both his and Ms. Hyatt's fingerprints would be on it.  The officers arrested Mr. Whittle.

3

{¶7} Upstairs, a paramedic peered inside Ms. Hyatt's open purse, sitting next to her on the bed, and pointed at the purse while making eye contact with the other paramedics, indicating that he saw something of concern—a syringe. The paramedic proceeded to query why she used a syringe, and she stammered, "well…uh…I…huh…" They then asked her if she was under the influence, and she equivocated, "No, I am not because he just came home with…no I'm not. Yes, I've used drugs, but he's been gone." And then, when they asked her what she uses when she does use drugs, she explained, "Well, I've used meth before, but I have not. I have court this week, and he left me at a hotel…" When Sergeant Courtney came to observe the syringe, the paramedic, while indicating "it's right on the top," tilted the bag for the officer to see inside.

{¶8} Sergeant Courtney then arrested Ms. Hyatt. Another Cheviot officer, Officer Miller, seized the syringe from Ms. Hyatt's purse and discovered marijuana and a second bag of a crystalized substance. Officers remained on the scene to care for her children until an adult arrived.

{¶9} Ms. Hyatt was subsequently indicted on two counts: aggravated possession of drugs, a third-degree felony, in violation of R.C. 2925.11(A), and possessing drug abuse instruments, a second-degree misdemeanor, in violation of R.C. 2925.12(A). She requested that the trial court suppress the evidence seized, specifically contesting the admission of all evidence seized from her bathroom, her purse, and her living room. In her motion, she argued that the searches exceeded the scope of a wellness check and were not justified by the plain view or search incident to arrest exceptions.

4

{¶10} The trial court ultimately denied her motion, finding the seizure of all the contested evidence was justified by the plain view exception to the warrant requirement. After denial of her motion to suppress, rather than go to trial, she entered a no contest plea regarding both counts. Following a sentencing hearing, the trial court sentenced her to three years of community control with orders that she continue her present drug treatment regimen at North Key Community Care and enter a probation-approved dialectical behavior therapy program. Ms. Hyatt now appeals.

II.

{¶11} In her sole assignment of error, Ms. Hyatt contends that the trial court erred when it denied her motion to suppress. In support of her argument, she raises four issues for our review: (1) whether the wellness check exception to the warrant requirement justified the search of the upstairs bathroom, (2) whether the plain view exception to the warrant requirement justified the searches of the upstairs bathroom and Ms. Hyatt's purse, (3) whether the additional searches conducted by the officers denoted a clear shift from a wellness check to a warrantless general, exploratory criminal investigation, and (4) whether the exclusionary rule requires suppression of any and all evidence flowing from the unconstitutional searches. We first outline the standard of review and the case law regarding warrantless searches. We then proceed by addressing each of her arguments in turn.

{¶12} A motion to suppress "presents a mixed question of law and fact." *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, ¶ 14, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. This court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583

5

(1982). " 'But we must independently determine whether the facts satisfy the applicable legal standard.' " *State v. Thompson*, 1st Dist. Hamilton No. C-200388, 2021-Ohio-3184, ¶ 10, quoting *State v. Taylor*, 174 Ohio App.3d 477, 2007-Ohio-7066, 882 N.E.2d 945, ¶ 11 (1st Dist.).

**{¶13}** Generally, "warrantless searches are per se unreasonable." *State v. Bacher*, 170 Ohio App.3d 457, 2007-Ohio-727, 867 N.E.2d 864, ¶ 8 (1st Dist.). But there are "a few well-established exceptions" to the warrant requirement. *State v. Ulmer*, 1st Dist. Hamilton Nos. C-190304, C-190305 and C-190306, 2020-Ohio-4689, ¶ 13, citing *State v. Ward*, 2017-Ohio-8141, 98 N.E.3d 1257, ¶ 13 (1st Dist.). The state maintains that the plain view exception justifies the searches in this case.

A.

**{¶14}** First, we consider the search of the upstairs bathroom. Ms. Hyatt contests this search and the seizure of a syringe from the bathroom trashcan. Specifically, she insists that Corporal Carter had no right to enter the bathroom, the search was not justified by the plain view exception, and the search was not justified as a protective sweep.

**{¶15}** But at the motion to suppress hearing, following the trial court's request that Ms. Hyatt narrow the issues being raised, her counsel acknowledged: "I'm not asking—I'm not asking for the needle that was found in the bathroom to be suppressed because—and this is going a little bit ahead of time, but that needle did not actually test for anything. And so there is no evidentiary value to it." Therefore, Ms. Hyatt did not request below that the trial court suppress the syringe discovered in the bathroom, and she waived her right to challenge that evidence for the first time on appeal. *See State v. Wright*, 1st Dist. Hamilton No. C-230456, 2024-Ohio-1763, ¶ 13 ("[W]hen a

6

defendant fails to present an argument at a suppression hearing, that argument is waived.").

{¶16} While Ms. Hyatt otherwise contested the legality of the bathroom search below, even if the search was impermissible, the remedy for an illegal search is the suppression of the evidence discovered by virtue of the search. Because she waived her right to challenge the admissibility of the syringe discovered during the bathroom search (and the syringe was the only evidence discovered in the bathroom), there is nothing to suppress.

B.

{¶17} Next, Ms. Hyatt contests the search of her purse, arguing that the syringe, marijuana, and bag of a crystalized substance discovered in her purse should be suppressed. In defense of the warrantless search of her purse below, the state asserted both the plain view and the search incident to arrest exceptions, and the trial court determined that the plain view (but *not* the search incident to arrest) exception justified the search. Because, on appeal, both Ms. Hyatt and the state confine their discussion of this search to the plain view exception, we limit our review accordingly.

{¶18} When the United States Supreme Court first expounded the plain view exception, "it prescribed 'a three-part analysis. First, the initial intrusion that brought the police into a position to view the object must have been legitimate. Second, the police must have inadvertently discovered the object. Third, the incriminating nature of the object must have been immediately apparent.' " *Thompson*, 1st Dist. Hamilton No. C-200388, 2021-Ohio-3184, at ¶ 12, quoting *State v. Halczyszak*, 25 Ohio St.3d 301, 303, 496 N.E.2d 925 (1986). But "the Court later clarified that the Fourth Amendment does not impose an inadvertence requirement in the plain view analysis,

7

reasoning that applying a standard dependent 'upon the subjective state of mind of the officer' causes significant difficulty in attaining 'evenhanded law enforcement.' " *State v. Lane*, 1st Dist. Hamilton No. C-230126, 2023-Ohio-4044, ¶ 10, quoting *Horton v. California*, 496 U.S. 128, 138, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Thus, under the Fourth Amendment, the plain view exception is generally applicable where the officers legitimately had a right to be where they observed evidence, and where the incriminating nature of that evidence was readily apparent.

{¶19} On appeal, while Ms. Hyatt acknowledges that inadvertence is no longer required for a plain view search under the Fourth Amendment, *see Thompson* at ¶ 12, she insists that Article 1, Section 14 of the Ohio Constitution supplies some type of inadvertence requirement. But Ms. Hyatt fails to cite Ohio authority substantiating this point or to otherwise explain textually why such a rule would flow from our state's constitution.

{¶20} Moreover, even if the Ohio Constitution required inadvertence, the seizure at issue would remain constitutional. As we reasoned in *Lane*, " '[i]nadvertence,' in search and seizure parlance, does not mean an officer has to trip over the evidence for it to be in plain view. Rather, for a search to qualify as inadvertent, an officer must ' "not know in advance the location of [certain] evidence and intend to seize it," ' relying on the plain-view doctrine only as a pretext." *Lane* at ¶ 13, quoting *Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 470, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). When the paramedic peered into Ms. Hyatt's open purse, he did not already know that it contained a syringe (or drugs). Even if he hoped to discover contraband, "without any particularized knowledge of the evidence to be seized, that

8

potential aspiration does not defeat the (former) inadvertence requirement of the plain view doctrine." *Id.*

{¶21} Therefore, the warrantless seizure of the syringe from Ms. Hyatt's purse "satisfies the plain view exception if: 1) the initial intrusion bringing the officer into a position to view the object was legitimate, and 2) the incriminating nature of the object was immediately apparent." *Thompson*, 1st Dist. Hamilton No. C-200388, 2021-Ohio-3184, at ¶ 15.

{¶22} While Ms. Hyatt does not contest that the officers were legally in the bedroom where they observed the syringe, she posits that the syringe was not actually in plain view, claiming that Corporal Carter observed only a syringe cap, and the paramedic grabbed and physically manipulated the purse as Sergeant Courtney peered into it to locate the syringe. But following the motion to suppress hearing where testimony and body-camera footage were presented, the trial court determined that the officer saw the syringe in plain view, as a factual matter: "The officer saw it. The corporal saw it. He didn't make it up. He saw it. If the other officer didn't see it, maybe. I don't know what happened. But he saw it, and it was there, and they retrieved it after she is arrested."

{¶23} This court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, at ¶ 14, citing *Fanning*, 1 Ohio St.3d at 20, 437 N.E.2d 583. Here, the body-camera footage supports the trial court's conclusion. A paramedic peered inside the open purse and pointed down while making eye contact with the officers, showing that he saw something of concern. When Sergeant Courtney came to observe the syringe, the paramedic stated, "it's right on the top," and moved

the bag for the officer to see it. The slight manipulation of the bag by the paramedic does not negate the fact that the syringe had already been observed in plain view.

**{¶24}** And finally, Ms. Hyatt asserts that the incriminating nature of the syringe was not immediately apparent, arguing that it is not unlawful to possess a hypodermic syringe and the observation of the suspected methamphetamine downstairs did not automatically enshroud the purse with an air of criminality. The incriminating nature of an object is immediately apparent when "police have 'probable cause to associate [the] object with criminal activity.' " *City of Cincinnati v. Langan*, 94 Ohio App.3d 22, 28, 640 N.E.2d 200 (1st Dist.1994), quoting *Halczyszak*, 25 Ohio St.3d at 305, 496 N.E.2d 925.

**{¶25}** Here, there was sufficient circumstantial evidence giving rise to probable cause to associate the syringe with criminal activity. Prior to the discovery of the syringe, the officers had already discovered methamphetamine and a syringe in the living room and another syringe in the bathroom trashcan. And following the discovery of the drugs and syringe in the living room, Mr. Whittle admitted that both his and Ms. Hyatt's fingerprints would be on the baggie of drugs. Further, around the same time, the paramedics questioned her about her need for and use of a syringe. In response, she was unable to explain a legitimate basis for possessing the syringe, fumbling her answers. And eventually, she admitted, "Well, I've used meth before, but I have not. I have court this week, and he left me at a hotel."

**{¶26}** While it remains unclear from the record whether the additional contraband seized from the purse was in plain view when the officer retrieved the syringe, this issue is not developed in the record. And Ms. Hyatt failed to separately raise any concerns with the discovery of this evidence on appeal, arguing only that all

evidence seized from the purse should be suppressed because of the impermissible discovery of the syringe.

**{¶27}** Therefore, based on this record, the plain view exception justified the seizure of the evidence from the purse.

C.

**{¶28}** Ms. Hyatt's final two arguments rest on the premise that there was some illegality in the searches that produced the contested evidence. But, as we detailed above, this is not the case—the relevant searches were justified by the plain view exception. Ms. Hyatt fails to advance any further independent argument that the contested evidence flowed from an illegal search. Accordingly, we see no basis for reversal in her final two issues.

\*  \*  \*

**{¶29}** In light of the foregoing analysis, we overrule Ms. Hyatt's sole assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**BOCK, P.J.,** and **KINSLEY, J.,** concur.


Please note:

The court has recorded its entry on the date of the release of this opinion.